**EAGLE STAR INSURANCE COMPANY, LTD., Appellant,**

v.

**Jo C. DEAL et al., Appellees.**

**No. 72–1157.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 17, 1972.

Decided March 9, 1973.

Bright, Circuit Judge, filed concurring opinion.

E. C. Gilbreath, Fort Smith, Ark., for appellant.

James W. Gallman, Fayetteville, Ark., for appellees.

Before LARAMORE, United States Court of Claims Senior Judge, and BRIGHT and ROSS, Circuit Judges.

LARAMORE, Senior Judge.

This case involves an insurance coverage question arising out of an aircraft accident which occurred on March 6, 1971, while Dr. Phil L. Deal was piloting his plane with five passengers aboard. Upon approach for landing at Harrison, Arkansas, Deal's plane crashed, killing everyone on board. Eagle Star Insurance Company, Ltd. had issued to Deal an aircraft liability policy which was in full force and effect on his aircraft at the time of the accident. However, Eagle Star brought suit for declaratory judgment asserting that there was no coverage in this case because of the "employee exclusion" clause,[1] under which it contended that the five deceased passengers were employees of Dr. Deal *or* that they were entitled to workmen's compensation benefits. Eagle also contended that Deal was making an improper use of the aircraft which, if true, would also void coverage.

In an opinion reported at 337 F.Supp. 1264 (W.D.Ark.1972), the District Court held, contra to Eagle's contentions, that there was coverage under the policy issued by Eagle Star to Dr. Deal. The court found, as a matter of fact, that the five decedent passengers were employees of Ozark Lab, Inc., not Dr. Deal, and that, in any case, the five decedents were not engaged in the duties of their employment at the time of the accident. Although the court noted that it was without jurisdiction to determine entitlement to workmen's compensation benefits, the court found, for purposes of the exclusion relied upon by Eagle, that decedent passengers were not entitled to workmen's compensation benefits. In addition, the lower court held that the exclusion for improper use of the aircraft was not applicable.

Appellant, Eagle Star, asserts that the above factual findings are unsupported by substantial evidence and the holding of the District Court is clearly erroneous. While the evidence in this case is essentially undisputed, appellant contests the inferences and the conclusions of law based thereon. For the reasons set forth herein, we must sustain the appellant's position.

The uncertainty which exists in this case arises largely from the fact that in October 1968, Dr. Deal organized "Ozark Lab, Inc.," an Arkansas corporation of which Dr. Deal was president, sole director and sole shareholder. It appears uncontradicted that Deal set up Ozark solely as a means of denuding himself of his employees for pension and profit sharing purposes. That is, he wished to remove his staff from "his employment" as an orthodontist, so that when he later adopted a retirement or deferred com-

---

1. "This policy does not apply:
    4. Under Coverages A, B or D to bodily injury, to sickness, disease or death of any employee of the insured while engaged in the duties of his employment or to any obligation for which the insured or any company as his insuror may be held liable under any Workmen's Compensation Law."

pensation plan for himself it would not be necessary for him to make contributions for his qualifying employees.[2] Aside from this purpose, the evidence does not disclose any further independent business purpose for Deal's organization of Ozark Lab, Inc. As the District Court indicated, Deal went through the various formalities of making Ozark a separate business entity, including maintenance of separate books of accounting and filing of appropriate tax returns. By April 1, 1970, Dr. Deal had transferred all of his former, non-domestic employees to Ozark, and two of his subsequently hired employees were placed directly on the Ozark Lab payroll. At the time of the accident, all five of the decedent passengers were "employed" by Ozark Lab.

■■ Appellant refers to the foregoing motives and various additional evidence as indicating that "Ozark Lab, Inc. amounted to nothing more than a payroll account for Phil L. Deal," and as a result such entity should be disregarded. The District Court, on the other hand, concluded that Eagle had "not met the burden of proof necessary to pierce the corporate veil," or otherwise demonstrate that Ozark was invalid. While substantiation of Ozark's invalidity would serve to illustrate that the dece-

dent passengers were *de facto* employees of Deal's, the insufficiency of the evidence to "pierce the corporate veil" is not, however, controlling of the issue of whether the decedents were Dr. Deal's "employees".[3] For notwithstanding the fact that Ozark may have been a valid corporation with the decedents technically being "employees" of that entity, it is possible that they were *also* employees of Dr. Deal. This possibility was recently noted in Beaver v. Jacuzzi Brothers, Inc., 454 F.2d 284 (8th Cir. 1972), where this court, in determining whether a person was an employee under Arkansas law, stated:

* * * As a matter of common experience and of present business practices in our economy, it is clear that an employee may be employed by more than one employer even while doing the same work. Biggart v. Texas Eastern Transmission Corp., 235 So.2d 443, 445 (Miss.1970).

■ Although *Beaver* and *Biggart* deal with the employer-employee relationship within the context of workmen's compensation, we find this general principle to be equally applicable to the determination of employee status within the context of an insurance exclusion, as it is an observation of the economic realities of today's business world

2. Although not determinative of the issues herein, it is pertinent to note that because of the evidenced intent, Dr. Deal probably could not have adopted a valid pension plan.

3. As noted by the District Court, "[i]t is only when the privilege of transacting business in the corporate form has been illegally abused to the injury of a third person that the corporate entities should be disregarded." Rounds & Porter Lumber Co. v. Burns, 216 Ark. 288, 225 S.W. 2d 1, 2–3 (1949). "Piercing the corporate veil" is most frequently applied in instances where third parties seek to place *financial responsibility* on those individuals or separate corporate entities who, because of their ownership or control and means of operating the corporation, can be said to be the party responsible for the actions of the corporation to be disregarded. Black & White v. Love, 236 Ark. 529, 367 S.W.2d 427 (1963); Plant v. Cameron Feed Mills, 228 Ark. 607, 309 S.W.2d 312 (1958); Banks v. Jones, 239 Ark. 396, 390 S.W.2d 108 (1965); Henderson v. Rounds & Porter Lumber Co., 99 F.Supp. 376 (D.C.Ark.1951); Green v. Equitable Powder Mfg. Co., 95 F.Supp. 127 (D.C.Ark.1951). Although there is a certain amount of overlap between the considerations pertinent to "piercing the corporate veil" for financial responsibility reasons and those relevant to determining the substantive employer-employee relationship, the factors are not identical and they are weighted differently in light of the distinct purposes to be resolved. Because our purpose herein is a determination of whether the decedents were employees of Dr. Deal, we find it unnecessary to decide whether the evidence was sufficient to "pierce the corporate veil" or otherwise demonstrate Ozark's invalidity.

and there is nothing peculiarly esoteric about this fact which would make it indigenous to workmen's compensation law. Consequently, we cannot agree with the lower court's suggestion that interpretations of workmen's compensation laws are not relevant to insurance exclusions. Campbell v. American Farmers Mutual Ins. Co., 238 F.2d 284 (8th Cir. 1956). Although there are differences in the general construction of each (*e. g.*, exceptions and words of limitation in liability policies are to be strictly construed against an insurer, Aetna Casualty & Surety Co. v. Stover, 327 F.2d 288 (8th Cir. 1964), while workmen's compensation laws must be liberally construed in furtherance of the purpose for which they were enacted, Huffstettler v. Lion Oil Co., 208 F.2d 549 (8th Cir. 1954)),[4] there can be little doubt that the essential elements of employment remain the same regardless of the context. Moreover, a review of cases in both areas discloses their common reliance on the older, more general principles of master-servant, despite the different contexts.

The Arkansas courts have not addressed this question directly, but we do note that in Walker v. Countryside Casualty Company, 239 Ark. 1085, 396 S.W. 2d 824 (1965), the Arkansas Supreme Court adopted rather liberal criteria in determining whether a casual employee was, in fact, an "employee" for purposes of an insurance exclusion clause. Utilization of this liberal criteria resulted in finding that the injured party was an employee, which in turn denied him coverage under the liability policy, notwithstanding the general rules of construction in favor of coverage.

■ In any event, it is clear that undefined terms of an insurance policy, such as "employee," must be construed in their plain, ordinary and everyday

sense and the parameters of the definition should reflect the legal characteristics most frequently attributed to the word. Jefferson Insurance Co. of Pine Bluff, Ark. v. Hirchert, 281 F.2d 396 (8th Cir. 1960); State Farm Mutual Automobile Insurance Co. v. Pennington, 324 F.2d 340 (8th Cir. 1963). Such guidelines suggest that economic reality and substance, rather than legalistic form, should be determinative of the word's meaning.

■ In considering the employment relationship, the factors to which the Arkansas courts have most frequently referred include employer's right to direct and control the employee, the right or power to hire or discharge, employer's furnishing of tools, duration and time of employment, and fact, manner and basis of payment. Irvan v. Bounds, 205 Ark. 752, 170 S.W.2d 674 (1943); Clemons v. Bearden Lumber Co., 236 Ark. 636, 370 S.W.2d 47 (1963). These factors have usually been applied in distinguishing between an "employee" and an "independent contractor," but as the business relations have become more complex, *e. g.*, with sub and sub-sub contractors, and temporary agencies as in *Beaver,* the element of control has emerged as generally being the most important determinant. Clemons v. Bearden, *supra;* Brinkley Heavy Hauling Co. v. Youngman, 223 Ark. 74, 264 S.W.2d 409 (1954); Beaver v. Jacuzzi Brothers, *supra.* Nonetheless, the status of employment is a question of fact to be considered in light of all of the surrounding facts and circumstances. Walker v. Countryside Casualty Co., *supra.*

■ A review of the facts in this case against the framework set out above leads us to the inescapable conclusion that the decedent passengers were, in fact, employees of Dr. Deal. Although Dr. Deal went through the neces-

---

4. It might be noted that while liberal constructions of workmen's compensation laws may have served the employee's best interests at one time, such situation has changed markedly where encompassment by workmen's compensation precludes a

potentially greater recovery from insurance or tort action. This was the case in both *Beaver* and *Biggart,* and, notwithstanding the detrimental ramifications, the courts found the respective parties to be employees.

sary formalities to set up Ozark and maintain it as a separate business, the thrust of the evidence is to the effect that there were no substantive changes in his orthodontic practice or in his relationship to the decedent passengers. He continued to exercise control over his staff in the details of their work in assisting him and he continued to exercise his authority to hire and discharge personnel as necessary.

Appellees contend, however, that these circumstances fail to account for the fact that Dr. Deal was also president of Ozark and that it was only natural for him to exercise such control as a result of this position. This assertion would bear more weight if not for two factors. First, Dr. Deal drew no salary from Ozark Lab, Inc. From this we must infer that Dr. Deal did not see his role as president of Ozark and its appurtenant duties to be of sufficient demand on his time to merit remuneration. Instead, he obviously saw his control and authority as being a function of his position as an orthodontist, not as president of Ozark Lab, Inc. Secondly, the services and supplies which Ozark rendered to other dentists constituted only one percent of Ozark's gross receipts. As a result, it is evident that the primary function and purpose of Ozark Lab and its "employees" was, as always, to service and support Dr. Deal's orthodontic practice. As a matter of economic reality, the decedents were totally dependent on Dr. Deal's orthodontic practice and it was on behalf of Dr. Deal as an orthodontist that they rendered their services. Fruco Construction Co. v. McClelland, 192 F.2d 241 (8th Cir. 1952); Westover v. Stockholders Publishing Co., 237 F.2d 948 (9th Cir. 1956). In this respect, it is pertinent to note that none of Ozark's lab work was done in Harrison, but rather only the performance of Dr. Deal's orthodontic services. At the time of the accident the decedents were flying to Harrison with Dr. Deal to assist him in his orthodontic practice; therefore, it is particularly obvious that they were employees acting for and on behalf of Dr. Deal as an orthodontist, rather than Dr. Deal as president of Ozark Lab, Inc., at the time of this accident. The adoption of the variant business structure and the payment of wages through Ozark did not serve to alter the substantive economic realities of the employment relation. The decedent passengers were employees of Dr. Deal in the ordinary sense of the word and the District Court's holding to the contrary is clearly erroneous.

■ We are now confronted with the question of whether the decedent employees were "engaged in the duties of (their) employment" at the time of the accident. The District Court stated that such phrasing "requires more than the passive act of accepting transportation afforded gratuitously by the employer," but we do not find this holding to be a valid reflection of the facts herein or the current status of Arkansas law. While this court has previously noted in Bryan v. Aetna Casualty & Surety Co., 381 F. 2d 872 (8th Cir. 1967) that the position of the Arkansas courts on "employer-furnished transportation" is less than certain, we nevertheless held therein that an employee was *"injured in the course of such employment"* where the employee's injury occurred while riding on his employer's bus from the employer's warehouse to a jobsite. We reached this conclusion notwithstanding the fact that the bus ride was not mandatory, and the employee could have reached the jobsite by other means.

The precedential value of *Bryan* is not entirely clear, however, inasmuch as it dealt with the type of employee exclusion clause which is couched in terms of "in the course of * * *" or "arising out of and within the scope of employment," whereas we here deal with *"while engaged in the duties of his employment."* Some courts have found this variation in terminology to be a decisive difference, e. g., Passmore M. & R. Co. v. New Amsterdam Casualty Co., 147 F. 2d 536 (10th Cir. 1945), suggesting that

those clauses using "engaged" draw narrower parameters of exclusion as the word "engaged" connotes action. Travelers' Indemnity Co. of Hartford v. Smith, 190 Ark. 492, 79 S.W.2d 1008 (1935) is in accord as to engaged denoting action, but Arkansas courts have not commented on the differences, if any, of these two types of employee exclusion clauses.

In Commercial Casualty Ins. Co. v. Cherry, 190 Ark. 422, 79 S.W.2d 270 (1935) the Arkansas Supreme Court held that cotton-pickers were not *"engaged in the business of the assured"* while riding back from the cotton fields on the owner's bus to their homes. The court emphasized that the injured had not picked cotton that day due to rain, and as a result had not been engaged in the business of their master. The court implied that the holding might have been different had they engaged in work that day. It is also pertinent to note that (1) the cotton-pickers were not regular employees, but rather a varying group of occasional employees, and (2) the bus ride was within the "going to work and returning home" situation. Because of the considerably different factual setting and the variant form of the exclusion clause, we find *Cherry* to be of minimal assistance with the issue herein.

In Martin v. Lavender Radio & Supply, Inc., 228 Ark. 85, 305 S.W.2d 845 (1957) the Arkansas Supreme Court considered whether an employee was within the "scope of his employment" while driving his own car from home to work. The uncertainty stemmed from the fact that the employee often stopped on his way to work at the post office to pick up the employer's mail. The court stated:

> * * * The decisive test must be whether it is the employment or something else that has sent the traveler forth upon the journey or brought exposure to its perils. [*Id.* at 849.]

In *Martin* the court interpreted this test as meaning that the employee was not within the "scope of his employment" until he reached the point in his trip to work where he would turn off for the post office, and until that time his principal purpose was only reaching his regular place of employment. Implicit in this interpretation was the fact that reporting to the normal place of employment from one's home is not within the "scope of employment," at least when the employee was supplying his own transportation.

To the extent that the above test is applicable here, it is clear that the duties of the decedents' employment had sent them forth upon the journey which brought exposure to the subsequent tragedy, as they had deviated from their normal place of employment when they embarked on this trip to service Dr. Deal's patients.

While the foregoing cases set out the framework within which this issue must be considered, the question presented remains one of fact. Specifically, the question devolves to whether flying from Fayetteville to Harrison was a "duty of their employment," as this was the activity in which they were "engaged" at the time of the accident. From all of the surrounding facts and circumstances we must conclude that the flight was such a duty.

In reaching this conclusion it is important to first recognize, as suggested above, that the trip from Fayetteville to Harrison was not within the "going to work and returning home" situation. This is apparent not only from the fact that Fayetteville was the main office of operations, but is also evidenced by the apparent necessity of having a $34,000 plane to make the trip. Secondly, there can be little doubt that going to Harrison when Dr. Deal requested was as much a duty or obligation of their employment as assisting Dr. Deal in the Fayetteville office. Furthermore, there is various testimony indicating that the

employees were considered "on the job" when they reported to the Fayetteville airport at 8:00 a. m., which was also their regular reporting time when they worked at the Fayetteville office. While there is some conflict in testimony as to whether it was mandatory to reach Harrison via Dr. Deal's airplane,[5] we do not find the mandatoriness of the flight determinative. The employees had to go to Harrison and they had accepted Dr. Deal's flying them there as a means of fulfilling their duty to be in Harrison. That there may have been alternative means of fulfilling the duty of going to Harrison is immaterial. The fact is that they were engaged in a duty of *their employment when they were going* to Harrison—be it via Dr. Deal's airplane or otherwise. Consequently, we must conclude that the employees were "engaged in the duties of (their) employment" when flying to Harrison.

In light of this conclusion, we must further hold that the employee exclusion clause is applicable here to deny coverage, and the lower court's holding to the contrary is clearly erroneous. Because of our holding as to this first portion of the employee exclusion clause, we find it unnecessary to also consider whether the employees were entitled to workmen's compensation benefits or whether use of the plane was improper. Judgment is hereby reversed.

BRIGHT, Circuit Judge (concurring).

Since the facts affirmatively demonstrate that the decedents met death in Dr. Deal's airplane while enroute to Harrison, Arkansas, for the purpose of assisting Dr. Deal in his practice of orthodontia, these decedents occupied the status of employees of Dr. Deal and as such are excluded from the coverage of the policy here in question. For this reason I concur in the result.

---

5. One witness testified that an employee lost her job because she would not fly with Dr. Deal any more, while another witness stated that she thought it did not matter how the employees reached Harrison as long as they did so on time.