**ENTERTAINMENT INNOVATORS, INC., Doc Murdock's Inc., and J.P. Warren, Plaintiffs,**

v.

**SCOTTSDALE INSURANCE COMPANY, Defendant.**

Civ. No. 93–5040.

United States District Court, W.D. Arkansas, Fayetteville Division.

Dec. 13, 1993.

W.H. Taylor, Mashburn & Taylor, Fayetteville, AR, for plaintiffs.

John Leslie Evitts, III, Hardin, Jesson, Dawson & Terry, Fort Smith, AR, for defendant.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action for declaratory judgment filed by Entertainment Innovators, Inc., Doc Murdock's Inc., and J.P. Warren on October 22, 1992, in the Chancery Court of Washington County, Arkansas. The action was removed to this court by the defendant on the basis of diversity of citizenship on March 23, 1993, after the dismissal of a non-diverse defendant.

### Background.

The plaintiffs seek a declaration that the defendant is obligated under the terms of a general comprehensive liability insurance policy number GLS172856 to pay a compensatory damage award and an award of attorney's fees and costs rendered against the plaintiffs in civil case number 91–5159, *Jenkins, et al. v. Entertainment Innovators, Inc., et al.*[1]

The policy was in full force and effect at the time the judgment was rendered. In fact, Scottsdale provided a defense in the *Jenkins* case. The parties have agreed to submit this case to the court for decision based upon the stipulated facts and the briefs of the parties.

In *Jenkins* the plaintiffs, Bradford Jenkins, III, Willie Jenkins, and James and Martha Bradley on behalf of their minor children Torrance, Camalita and Brett, brought a number of claims against the defendants arising out of incidents occurring on August 9, 1991, and October 30, 1991, at Doc Murdock's Dance Hall in Fayetteville, Arkansas.[2] At the conclusion of the trial, three separate federal claims were submitted to the jury, conspiracy to violate the civil rights of the plaintiffs and other black patrons of Doc Murdock's under 42 U.S.C. § 1985(3), neglect to prevent civil rights violations under 42 U.S.C. § 1986, and denial of equal access to a place of public accommodation under 42 U.S.C. § 2000a. Three state law claims, intentional infliction of emotional distress, battery, and negligent failure to maintain the premises in a reasonably safe condition, were also submitted to the jury.

The jury returned verdicts in favor of the plaintiffs on the following claims: conspiracy to deprive Bradford Jenkins, III, of his civil rights and awarded him $3.00 in compensatory damages on this claim; neglect to prevent a conspiracy and awarded Bradford Jenkins, III, $1.00 in compensatory damages on this claim; battery with respect to Torrance Bradley and Brett Bradley and awarded Torrance Bradley $125.00 in compensatory damages and Brett Bradley $4.00[3] in compensatory damages; and failure to maintain the premises in a reasonably safe condition and awarded compensatory damages in the amount of $1250. The jury also awarded the plaintiffs punitive damages. Judgment in the *Jenkins* case was entered on September 23, 1992. The total amount of the judgment was $23,883.00. This judgment amount was

---

**1.** Plaintiffs originally contended the policy also covered the punitive damage award rendered in the *Jenkins* case. Plaintiffs now concede that a policy endorsement expressly excludes coverage for awards of punitive and exemplary damages.

**2.** The undersigned presided over the *Jenkins* case.

**3.** This amount was later reduced to $3.00 with the agreement of the plaintiffs.

later reduced by $1750 to $22,132.00 by the court in ruling on a motion for judgment as a matter of law. Of this amount $20,750 represented an award of punitive damages and is no longer in issue. Thus, there remains only $132.00 in compensatory damages at issue. The court also awarded plaintiffs attorney's fees in the amount of $32,500 and costs in the amount of $6933.45. Plaintiffs also contend Scottsdale is liable for these sums.

Plaintiffs made demand on Scottsdale to pay the judgment and award of attorney's fees and costs entered in the *Jenkins* case. Scottsdale paid $1250.00 awarded on the negligence claim and declined to pay any further amounts.[4] Scottsdale advances the following arguments: (1) the damages awarded for conspiracy to violate civil rights and neglect to prevent a conspiracy to violate civil rights do not fall within the policy definitions of bodily injury or property damage; (2) the damages awarded for conspiracy to violate civil rights, neglect to prevent a conspiracy to violate civil rights and battery are intentional acts and do not fall within the policy definition of occurrence; (3) the attorneys fees and costs were assessed by virtue of plaintiffs' recovery on intentional and non-covered events and are therefore not recoverable under the policy.

### Applicability of the Definitions contained in the Jacket.

As a preliminary matter the court is asked to determine whether or not the insurance jacket which contains, among other things, certain definitions is to be regarded as part of the policy. It is the plaintiffs' position that the definitions contained on the jacket are not part of the policy because the policy does not incorporate the definitions and there was no physical attachment of the jacket to the actual policy. Plaintiffs state that the only alleged relationship between the definitions on the jacket and the actual policy numbered GLS 172856 was their purported physical proximity to each other.

Scottsdale contends that the general liability insurance policy consists of a jacket which contains policy definitions and contract language and the coverage parts and endorsements which together comprise the entire insurance policy. Defendant informs the court that the provisions of the jacket are three pages long and the coverage parts and endorsements are attached to page three of the jacket in such a manner as to permit the policy number and the insured's name and address to appear through the jacket window.

The court has been furnished a copy of the jacket, the coverage sections, and the endorsements to the policy. The jacket contains in the lower left hand corner the notation GLS–J–1 and consists of three pages. The first page indicates the name and address of the insurance company and is labeled "Policy Provisions–Part A."

The three pages contain definitions, supplementary payment terms, and conditions including the insured's duties in the event of occurrence, claim or suit. Page one begins with the following statement: Scottsdale Insurance Company in consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the named insured as follows: When used in this policy (including endorsements forming a part hereof)...." Page three of the jacket states "[i]n Witness Whereof, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company." This statement is followed by the signatures of the secretary and president of the insurance company. At the top of page three it states "Insert Part B here so that top edge butts against above fold to permit policy number, Insured's name and address on Part B to appear through window. Attach Coverage Part(s) and Endorsement(s) (If Any) Here."

These pages are followed by the declaration page which indicates the policy number, the insured's name, the type of policy, the premium, the policy period, and lists by number the applicable endorsements. The declaration page is stamped "this is a true and

---

4. Carlon Bassett in his deposition states that Scottsdale paid $1000 on this claim and the plaintiffs paid $250. The $250 representing the amount of the deductible.

certified copy of the designated policy."[5] Thereafter, the materials submitted consist of an additional declaration page, one page discussing coverage A for bodily injury liability and coverage B for property damage liability, and a number of pages setting forth endorsements and amendments. While the jacket refers to the provisions of the policy including endorsements, the coverage parts and endorsements do not refer to the jacket. Endorsement L9194, however, states it amends the definition of "products hazard" which is contained in the definitions section of the jacket.

Plaintiffs do not argue that they did not receive the jacket and in fact the only testimony in this regard is that of Carlon Bassett where he states he did not remember the jacket. Plaintiffs also present no evidence that the jacket was not attached. Plaintiffs merely cite *Black & White, Inc. v. Reserve Ins. Co.*, 242 Ark. 573, 414 S.W.2d 369 (1967) and *American Pioneer Life Ins. Co. v. Allender*, 18 Ark.App. 234, 713 S.W.2d 249 (1986) for the proposition that without words of incorporation on the policy (which they contend begins with the stamped declaration page) or physical attachment the jacket does not become part of the policy.

The court would have little hesitation adopting plaintiffs' position if plaintiffs had presented evidence that they did not receive the jacket with the coverage sections and the endorsements. If that were plaintiffs' position the court would undoubtedly find that the plaintiffs were not on inquiry notice that other provisions of the policy were missing. This would be true because the pages received would not refer to the jacket or the materials contained therein. A similar argument was presented to the court in *Twin City Fire Ins. Co. v. Terry*, 472 S.W.2d 248 (Ky.1971). In that case the insurer presented evidence that the policy was assembled by glueing together three separate documents one of which, referred to as part 1, was so adapted as to form a jacket for the document. The insured presented evidence that a portion of the policy containing a one-year limitation was never received. The court held the meager statements in the forms

received were insufficient to put the insured on notice or inquiry.

The *Twin City Fire* case, however, is readily distinguishable. As the plaintiffs have presented no evidence that they did not receive the jacket, we must assume that the policy was assembled as defendant states. An insured receiving the jacket would by the terms of the jacket be advised that it was considered part of the policy. We therefore hold the definitions contained in the jacket constitute a part of the policy under the circumstances herein.

### General Rules of Construction.

The law is well-settled that a policy of insurance is nothing more than a contract between the insurance carrier and its insured, and is to be governed by the ordinary rules of interpretation of a contract. *Perkins v. Clinton State Bank*, 593 F.2d 327 (8th Cir.1979); *Tri–State Ins., Co. v. Sing*, 41 Ark.App. 142, 850 S.W.2d 6 (1993). A common sense approach should be used and generally the words employed in the policy are to be construed in their plain, ordinary, and popular sense. *Wommack v. United States Fire Ins., Co.*, 323 F.Supp. 981 (W.D.Ark. 1971); *Tri–State Ins., Co. v. Sing*, 41 Ark. App. 142, 145, 850 S.W.2d 6 (1993). "[U]ndefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the parameters of the definition should reflect the legal characteristics most frequently attributed to the word." *Eagle Star Insurance Co., Ltd. v. Deal*, 474 F.2d 1216, 1220 (8th Cir.1973). "Such guidelines suggest that economic reality and substance, rather than legalistic form, should be determinative of the word's meaning." *Id.*

It has been stated:

Contracts of insurance should receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties in the light of their general object and purpose. The terms of an insurance contract are not to be rewritten under the rule of strict construction against an insurer so as to bind

5. Plaintiffs contend the "policy" begins with this page.

the insurer to a risk which is plainly excluded and for which it was not paid. *Id.* (citations omitted).

"In order to be ambiguous, a term in an insurance policy must be susceptible to more than one reasonable construction." *Insurance Co. of N. America v. Forrest City Country Club*, 36 Ark.App. 124, 819 S.W.2d 296 (1991) (citation omitted). "If some ambiguity creeps in, the interpreting court must first seek resolution within the wording of the instrument before resort to extraneous information is used." *Hancock v. Tri–State Ins. Co.*, 43 Ark.App. 47, 858 S.W.2d 152 (1993). Courts are required to "strictly interpret exclusions to insurance coverage and to resolve all reasonable doubts in favor of the insured who had no part in preparation of the contract." *Security Insurance Co. v. Owen*, 252 Ark. 720, 725, 480 S.W.2d 558 (1972).

## Discussion.

The coverage portions of the policy states that the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence. The policy defines bodily injury as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." Occurrence is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

We are asked to determine whether damages awarded for civil rights violations under §§ 1985 & 1986 fall within the definition of bodily injury contained in this policy. Defendant contends that damages awarded for conspiracy to violate civil rights under 42 U.S.C. § 1985, and neglect to prevent a conspiracy to violate civil rights under 42 U.S.C. § 1986, are not covered by the policy because there is no evidence that the damages were awarded for bodily injury. Defendant points out that damages under §§ 1985 & 1986 can be awarded for a variety of reasons, such as injury to property, deprivation of civil rights, deprivation of privileges, and for personal injury.

In opposition plaintiffs contend the amounts awarded under §§ 1985 & 1986 represent awards for bodily injuries which arose out of the incidents at Doc Murdock's Dance Hall. It is argued that the interrogatories in the *Jenkins* case establish that "it was more probable than not that the jury's award of damages was based upon bodily injury." We are told that both sections 1985 and 1986 include and refer to bodily injury. Plaintiffs also argue that the jury was presented with the opportunity to award non-bodily injury damages or psychological damages based upon the tort of outrage claim and the denial of access to a public place of accommodation claim. Plaintiffs argue the jury in choosing not to award damages on these claims chose not to award non-bodily injury damages.

We cannot make such a conclusion from the interrogatories. With respect to conspiracy to interfere with civil rights the jury was instructed that the *Jenkins* plaintiffs must prove the following essential elements: (1) two or more persons must conspire; (2) the purpose of the conspiracy must be to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws or of the equal privileges and immunities under the laws; (3) that one or more of the conspirators did or caused to be done an act in furtherance of the object of the conspiracy; and (4) the plaintiffs must show that they have suffered some injury as a result of the conspiracy. With respect to the second element, the jury was told there must be some intentionally racially discriminatory purpose behind the conspirators' action. With respect to the third element, the jury was instructed the plaintiffs must prove, by a preponderance of the evidence, that the conspirators caused an injury to the plaintiffs, that is, physical harm or emotional distress, in furtherance of a racially discriminatory conspiracy.

With respect to the section 1986 claim, the jury was instructed that the *Jenkins* plaintiffs must prove the following elements: (1) a conspiracy to violate civil rights; (2) the de-

fendants having knowledge of the wrongs to be done had the power to prevent or aid in the prevention of a civil rights violation; (3) one or both of the defendants neglected or refused to prevent or aid in preventing the commission of such a violation; and (4) the plaintiffs must show that they have suffered some injury as a result of the civil rights violation which would have been avoided if the defendants had acted with reasonable diligence to prevent the violation.

Unless civil rights damages are in general to be characterized as bodily injury damages, we cannot find from the issues submitted to the jury or the jury's answers to the interrogatories that the damages assessed necessarily represent bodily injury damages. Nor can an inference be drawn from the fact that the *Jenkins* plaintiffs did not prevail on certain claims.

Even if we find the damages awarded under §§ 1985 and 1986 fall within the policy definition of bodily injury, defendant argues these and the damages awarded for battery do not fall within the policy coverages because all of these damages were awarded for actions not caused by an occurrence as defined by the policy. In opposition plaintiffs state the plain meaning of the term occurrence does not exclude intentional activity.

As previously noted, the policy defines occurrence as "an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the insured." In *Geurin Contr. v. Bituminous Cas. Corp.*, 5 Ark.App. 229, 636 S.W.2d 638 (1982), the Arkansas Court of Appeal was faced with the identical definition of occurrence. The court noted "[t]he key issue in determining whether an 'occurrence' is within the coverage of an insurance policy such as this is whether the occurrence was expected or intended by the insured." *Id.* at 234, 636 S.W.2d 638.

In *Continental Ins. Co. v. Hodges*, 259 Ark. 541, 534 S.W.2d 764 (1976) the court also addressed a similar definition in connection with a property damage claim. The term occurrence was defined, as it is here, as an accident. The court noted:

The term "accident" is not defined in the policy, but as pointed out in 44 Am.Jur.2d *Insurance* § 1219 (1969), "The definition that has usually been adopted by the courts is that an accident is an event that takes place without one's foresight or expectations—an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected."

*Id.* at 542, 534 S.W.2d 764. The dispute in the *Continental* case involved the alleged casting of surface water onto the neighbor's land. The court held "the damages alleged could not have taken place without foresight or expectations and did not involve any negligence on the part of appellees. Nor can it be said that the damages alleged proceeded from an unknown cause or were an unusual effect of a known cause." *Id.* at 544, 534 S.W.2d 764.

■ Various courts have ruled that the term occurrence when defined as it is here, excludes intentional or willful acts. *See e.g., Vaughner v. Pulito*, 804 F.2d 873 (5th Cir. 1986) (civil rights violations under 42 U.S.C. §§ 1981, 1982, and 3604 are predicated on intentional discriminatory acts and thus do not come within policy definition of occurrence); *Kline v. The Kemper Group*, 826 F.Supp. 123 (M.D.Pa.1993) (age discrimination does not come within policy definition of occurrence); *Commercial Union Ins. Companies v. Sky, Inc.*, 810 F.Supp. 249 (W.D.Ark.1992) (deliberate and intentional sexual misconduct could not be characterized as an occurrence as defined by the policy). Rather, the term refers to harm brought about by negligent or reckless conduct but not by an intentional act of the insured.

■ Clearly, the battery and § 1985 causes of action rest on intentional conduct. Accordingly, any damages awarded for injuries sustained by the *Jenkins* plaintiffs on these claims were not the result of an occurrence as that term is defined in the policy.

■ Section 1986 liability is, of course, derivative of liability under § 1985. Thus, is the absence of valid claim of actionable conspiracy no liability can be had under § 1986. *Kaylor v. Fields*, 661 F.2d 1177 (8th Cir.

1981). The cause of action requires that the defendant know of the conspiracy and "having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so...." 42 U.S.C. § 1986. *See also Washington v. Duty Free Shoppers*, 696 F.Supp. 1323 (N.D.Cal.1988). We conclude the policy's definition of occurrence does not extend to encompass civil rights actions brought under § 1986 since liability under this section is derivative of liability under § 1985 which requires intent and because § 1986 requires knowledge of the discrimination and at a minimum a decision not to take action to prevent the discrimination. In so holding we reject the plaintiffs' contention that § 1986 is essentially a negligence cause of action.

 Finally, we are asked to decide whether the attorney's fees and costs awarded to the *Jenkins* plaintiffs constitute damages under the insurance contract. Given the court's ruling above, the only claim on which coverage was afforded under the policy was the claim Scottsdale voluntarily paid, *i.e.*, negligent failure to maintain the premises in a reasonably safe condition. The fees and costs in question were awarded under 42 U.S.C. § 1988 which authorizes such an award to prevailing civil rights plaintiffs. Even if the court were to determine that the fees and costs were regarded as damages within the meaning of the policy, the company would have no obligation to pay them because of the court's ruling that the civil rights and battery damages awarded were not the result of an occurrence as required under the policy.

## Conclusion.

For the reasons stated, we conclude that Scottsdale has no further obligation to pay the judgment rendered against the plaintiffs in the *Jenkins* case. A separate order in accordance herewith will be concurrently entered.

1. Donna E. Shalala succeeded Louis W. Sullivan, M.D., as Secretary of Health and Human Services on January 22, 1993. Pursuant to Federal Rule of Civil Procedure 25(d)(1), Donna E. Shalala should be substituted for Louis W. Sullivan,

## *JUDGMENT*

On this 10th day of December, 1993, the court finds for the reasons stated in a memorandum opinion of even date that Scottsdale Insurance Company has no further obligation to pay the judgment rendered against the plaintiffs in the case of *Jenkins, et al. v. Entertainment Innovators, Inc., et al.*, Civil No. 91–5159. Accordingly, this action is dismissed.

IT IS SO ORDERED.