**SHELTER MUTUAL INSURANCE COMPANY, Plaintiff**

**v.**

**Bill J. GARDNER, Janet F. Gardner, Raymond Beans, Amy Beans, William N. Aitken, Ada S. Aitken, Don Toepfer, and Shores Hardware and Propane Gas, Inc., Defendants.**

Civ. No. 94–5114.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Jan. 6, 1995.

Timothy L. Brooks and W. H. Taylor, Mashburn & Taylor, Fayetteville, AR, for Bill and Janet Gardner.

Rex M. Terry, Hardin, Jesson, Dawson & Terry, Fort Smith, AR, for Raymond and Amy Beans.

Dale Garrett and Woody Bassett, Bassett Law Firm, Fayetteville, AR, for William and Ada Aitken.

Robert L. Jones, Jr., Jones, Gilbreath, Jackson & Moll, Fort Smith, AR, for Don Toepfer.

Tilden P. Wright, III, Davis, Cox & Wright, Fayetteville, AR, for Shores Hardware.

Thomas B. Pryor, Pryor, Barry, Smith, Karber & Alford, Fort Smith, AR, for plaintiff.

### MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This declaratory judgment action was filed by Shelter Mutual Insurance Company (Shelter) on June 22, 1994. Shelter seeks a declaration that it does not have a duty to defend a state court lawsuit currently pending between William and Ada Aitken and, *inter alia*, its insureds, Bill and Janet Gardner. Shelter additionally seeks a declaration that the policy in question does not provide coverage on the claim asserted by Mr. and Mrs. Aitken. The case has been removed from the trial docket and the parties have agreed that the court may resolve the issues on the basis of the materials submitted by the parties.

*Background.*

Shelter issued to Bill and Janet Gardner a commercial general liability policy. The Gardners first obtained liability insurance in February of 1991 in response to requests of general contractors for certificates of insurance. The initial policy was renewed on an annual basis and was in full force and effect on October 31, 1993.

Bill Gardner (Gardner) is a plumber doing business as a sole proprietor under the name Gardner Plumbing. He works primarily as a subcontractor installing piping and fixtures in newly constructed buildings. In March of 1991 Gardner entered into an oral contract with Don Toepfer (Toepfer) to install the plumbing (drains, water and gas lines) in a house Toepfer was constructing for William and Ada Aitken. Of particular relevance to this lawsuit, Gardner was to install certain pipes, valves, and fittings for the purpose of transmitting liquified petroleum (LP) gas to the appliances and fireplaces within the home.

Gardner commenced work in March of 1991. By March of 1992, the home was completed, Gardner was fully paid for his work, and the house including the plumbing fixtures were in use. Gardner did not have any service agreements or warranties or other obligations to the Aitkens regarding his work. No representations were made regarding the safety of the plumbing installation and the pipelines. *Gardner Deposition* at 69.

Toepfer selected separate defendant, Shores Hardware and Propane Gas, Inc. (Shores), to provide and install two 1000–gallon LP gas storage tanks to transmit the gas to household appliances via the pipes, valves, and fittings, installed by Gardner. The storage tanks were installed at the Aitkens home in July of 1991 when the home was still under construction. Arkansas liquified petroleum gas regulations require a pressure test, using plain air, of at least 25 pounds per square inch (psi) to check the pipes, valves, and fittings, and a certification to the state that there are no leaks. The installer of the tanks must fulfill this requirement before actually hooking up the LP gas

tanks and transmitting LP gas into the home.

In July of 1991, when the initial test was run a leak was found in the stone fireplace on the first level of the home. The Shores' employees refused to hook up the tanks until Gardner repaired the leak. On July 31, 1991, the Shores' employees returned to the home to run a second pressure test. Gardner allegedly told one Shores' employee, Joey Cagle, not to run the test above 20 psi because the "O-rings" in the fireplace valves would not withstand a higher pressure. No leaks were discovered when the test was run at the lower pressure and the tanks were installed. Cagle and Gardner certified the work as completed.

On May 12, 1993, a Shores' employee, Chris Miller, went to the Aitkens home to refill the LP tanks. Mrs. Aitken informed him that she had been experiencing gas loss and could smell gas in the home. Two leaks were discovered outside the home and repaired. A third leak was discovered at the fireplace valve in the living room when an air pressure test was performed at 25 psi or above. The Aitkens were informed of the leak which was inside the wall and the tanks hooked back up.

William Aitken telephoned Bill Gardner to apprise him of the situation and talk with him about what needed to be done. Mr. Aitken reached Janet Gardner and left a message for Mr. Gardner. The message was never returned. Chris Miller, the Shores' employee, encountered Bill Gardner a few days later and mentioned the leaks to Gardner who indicated unhappiness at having to return to the Aitken home to work on anything.

On October 31, 1993, the Aitkens home was destroyed by an explosion and fire allegedly caused by the leakage of liquified petroleum gas from a valve near the fireplace. Gardner had installed the valve. As of October 31, 1993, Gardner indicated there was nothing he was supposed to have performed that he had not performed. *Gardner Deposition* at 69.

On April 25, 1994, the Aitkens filed suit in the Circuit Court of Benton County, Arkansas, against Bills Gardner d/b/a Gardner Plumbing Service, Don Toepfer and Shores Hardware & Propane Gas, Inc. The complaint alleges, among other things, that Bill Gardner was guilty of negligence which was a proximate cause of the liquefied petroleum gas explosion. Specifically, it is alleged Gardner was negligent in the following respects: (1) failing to properly install the LP gas lines and related parts; (2) in failing to inspect and test the lines and related parts for leakage; (3) failing to correct and eliminate the leakage; (4) allowing the plaintiffs to occupy the home knowing the LP lines and related parts were allowing LP gas to escape into the structure; (5) failing to exercise the requisite degree of care; and (6) in installing automatic fireplace starters to be used with LP gas. Shelter is presently defending the state court lawsuit under a reservation of rights.

Shelter contends the policy provides no coverage for the damages at issue because of an exclusion contained in the policy endorsement for products—completed operations hazard. Shelter's contention is quite simply that the installation of all lines was complete and being used for more than one year prior to the explosion and fire.

The defendants in this case have each adopted portions of the briefs filed by other defendants. Thus, for purposes of discussion we will not attempt to segregate the arguments made by each defendant separately. First, it is argued that the definitions, in particular the definition of completed, are circular.

Second, it is argued that Gardner's work was never completed because (1) the proper pressure test was never run and (2) Gardner failed to provide proper warnings or instructions. The gist of the defendants' arguments in this respect is that the work Gardner did was not completed because of his negligence in installation and his failure to properly instruct or warn the Aitkens.

Third, it is argued that the exclusion does not apply at all because Gardner's work in selecting the valves occurred on Gardner's work in selecting the valves occurred on Gardner's premises and at his place of business. Even if the court considers the prem-

ises where the parts were installed to be the proper place to decide the issues under the policy, defendants reiterate their argument that the product itself was never complete because an improper type of fireplace valve was chosen and put into the system without warning of the possible consequences.

Fourth, defendants argue the system was never put to its intended use. Defendants state the use intended by Gardner and the Aitkens was a trouble-free LP gas system that did not leak, did not create the smell of gas in the home, and that did not cause a strangely high gas bill.

Finally, it is argued that Gardner's omission in failing to timely respond to the report of an LP gas leak invokes coverage under the policy which is totally separate and apart from the products completed operations hazard exclusion. This argument is premised in part on the deposition testimony of Bill Fulkerson, Shelter's agent, who indicated the policy provided coverage for occurrences relating to or arising out of service calls that a plumber made to an existing residence. It is argued that a finding of liability may be premised on a negligent omission to perform a certain act where a duty to act existed.

In response to this argument, Shelter contends that the failure to respond to the call in May of 1993 had certainly been abandoned or completed by the date of the loss on October 31, 1993. At best, Shelter argues the "alleged negligence relating to the phantom service call—and most emphatically the situation that existed five months after the alleged call—falls within the purview of 'work that may need service, maintenance, correction, repair or replacement,' which under the provisions of the policy 'will be treated as completed.'"

In their answer the Gardners assert estoppel. The Gardners' brief does not address this point and the court assumes the Gardners no longer wish to rely on this legal argument.

### Policy Provisions.

The insuring agreement provides as follows:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages.

*Policy,* 1(a) at p. 1.

The policy contains an endorsement which provides as follows:

### EXCLUSION—PRODUCTS—COMPLETED OPERATIONS HAZARD

This endorsement modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART.

This insurance does not apply to "bodily injury" or "property damage" included within the "products—completed operations hazard."

Section V of the policy defines "products-completed operations hazard" as follows:

11. a. "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession or;

(2) Work that has not yet been completed or abandoned.

b. "Your work" will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

c. This hazard does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condi-

tion in or on a vehicle created by the "loading or unloading" of it;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials;

(3) Products or operations for which the classification in this Coverage Part or in our manual of rules includes products or completed operations.

*Policy,* Section V, 11(a)-(c), page 11–12.

The policy also defines the terms "bodily injury," "property damage," "your product," and "your work." The terms are defined as follows:

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

12. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

14. "Your product" means:

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed by:

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

"Your product" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product," and

b. The providing of or failure to provide warnings or instructions.

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

15. "Your work" means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work," and

b. The providing of or failure to provide warnings or instructions.

*Policy,* Section V, pages 9–12.

### *General Rules of Construction.*

Of course, the law is well-settled in Arkansas that ambiguous provisions of an insurance policy will be construed against the insurance company that drafted it. *Aetna Cas. & Sur. Co. v. Stover,* 327 F.2d 288 (8th Cir.1964); *Reiter v. State Farm Mut. Auto. Ins. Co.,* 357 F.Supp. 1006 (E.D.Ark.1973); *Countryside Cas. Co. v. Grant,* 269 Ark. 526, 601 S.W.2d 875 (1980). The law is also well-settled that a policy of insurance is nothing more than a contract between the insurance carrier and its insured, and is to be governed by the ordinary rules of interpretation of a contract. Mark S. Rhodes, 12 Couch Cyclopedia on Insurance § 45:294 at 620 (Rev. Vol.2d Ed.1981), and *Perkins v. Clinton State Bank,* 593 F.2d 327 (8th Cir.1979).

A common sense approach should be used and generally the words employed in the policy are to be understood in their ordinary sense. *Wommack v. United States Fire Ins.,* 323 F.Supp. 981 (W.D.Ark.1971); *Tri–State Ins., Co. v. Sing,* 41 Ark.App. 142, 850 S.W.2d 6 (1993). If a fair reading of the provisions in question indicate that they are plain and unambiguous, the law is that the court will not use a forced construction of the terms of an insurance contract where no ambiguity exists, and must apply the law to the unambiguous terms. *Benton State Bank v. Hartford Acc. & Indem. Co.,* 452 F.2d 5 (8th Cir.1971); *Peacock & Peacock, Inc. v. Stuyvesant Ins. Co.,* 332 F.2d 499 (8th Cir. 1964); *Hardware Dealers Mutual Fire Ins. Co. v. Holcomb,* 302 F.Supp. 286 (W.D.Ark. 1969); *Southern Farm Bureau Cas. Ins. Co.*

*v. Williams,* 260 Ark. 659, 543 S.W.2d 467 (1976); and *Arkansas Blue Cross–Blue Shield, Inc. v. Tompkins,* 256 Ark. 370, 507 S.W.2d 509 (1974).

"[U]ndefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the parameters of the definition should reflect the legal characteristics most frequently attributed to the word." *Eagle Star Insurance Co., Ltd. v. Deal,* 474 F.2d 1216, 1220 (8th Cir.1973). "Such guidelines suggest that economic reality and substance, rather than legalistic form, should be determinative of the word's meaning." *Id.*

It has been stated:

Contracts of insurance should receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties in the light of their general object and purpose. The terms of an insurance contract are not to be rewritten under the rule of strict construction against an insurer so as to bind the insurer to a risk which is plainly excluded and for which it was not paid.

*Id.* (citations omitted).

"In order to be ambiguous, a term in an insurance policy must be susceptible to more than one reasonable construction." *Insurance Co. of N. America v. Forrest City Country Club,* 36 Ark.App. 124, 819 S.W.2d 296 (1991) (citation omitted). "If some ambiguity creeps in, the interpreting court must first seek resolution within the wording of the instrument before resort to extraneous information is used." *Hancock v. Tri–State Ins. Co.,* 43 Ark.App. 47, 858 S.W.2d 152 (1993). Courts are required to "strictly interpret exclusions to insurance coverage and to resolve all reasonable doubts in favor of the insured who had no part in preparation of the contract." *Security Insurance Co. v. Owen,* 252 Ark. 720, 725, 480 S.W.2d 558 (1972).

As the Arkansas Supreme Court said in *Rogers v. State Farm Ins. Co.,* 243 Ark. 887, 422 S.W.2d 677 (1968):

We recognize the distinction between the construction to be placed on an omnibus clause extending the coverage of an insurance policy and an exclusionary clause limiting or excluding coverage under a policy. We also recognize the modern trend to broaden coverage under omnibus clauses of insurance contacts, (*Industrial Indemnity Co. v. Continental Casualty Co.,* 375 F.2d 183 (10th Cir.1967)), but liberal construction should not extend coverage under an omnibus clause, or restrict it under an exclusionary clause, beyond the plain words and obvious intent and meaning of the words used in the contract.

*Id.,* 243 Ark. at 889, 422 S.W.2d 677.

***Discussion.***

With these principles in mind, we turn to an examination of the relevant case law and the parties' arguments. Our determination turns on (1) the language of the policy, and (2) the nature of the work performed.

In the case of *Tucker Construction Co. v. Michigan Mutual Ins. Co.,* 423 So.2d 525 (5th Dist. Fla.1982) the court provided a succinct discussion of the potential liability of a contractor and the coverages generally available. The court stated:

A manufacturer or a contractor or other person performing services for others faces two types of potential liability. One is contractual liability for failure to perform the contractual obligation and to deliver a product or service as agreed. The other is the usual potential tort liability attendant to all activity that results when one fails to use due care and thereby causes others personal injury or property damage. As a practical matter the potential for tort liability is different and greater during the manufacturing or service performing activity than it is thereafter and different liability insurance coverage applies while the work is in progress than applies after work is completed; but in either event, liability coverage does not cover the contractual liability involved.

Liability insurance protection for a manufacturer arising out of the process of producing or manufacturing goods is generally termed "premises liability" while liability protection coverage for the manufacturer once the goods are finished and moved away from the manufacturing premises is called "products liability." Similarly, a

628

person who performs a service on the premises of others, such as a building contractor, can obtain coverage while his work is in progress in the form of an "operations liability" insurance policy and, after work is completed, by a "completed operations" policy. Since a "premises liability" policy provides a manufacturer with the same type of coverage that an "operations liability" policy provides the service performer, some policies lump such coverage together as "premises/operations" coverage. Likewise, "products liability" for manufacturers equates with "completed operations" coverage for the service performer. However the "premises/operations" coverage and the "products liability/completed operations" coverage are mutually exclusive, each coverage protecting against a separate liability situation and each carrying a separate premium. Where tort liability results from poor workmanship or other activity on the contractor's part, whether the contractor's liability policy provides coverage or not depends on which of the two coverages is carried and when the injury or damage occurs.

*Id.,* 423 So.2d at 526–27.

■ The question of whether the project is complete is left to the courts to be determined on a case by case basis given the particular facts at issue. *See generally* Allan E. Korpela, Annotation, *Construction and Application of Clause Excluding from Coverage of Liability Policy "Completed Operations Hazards,"* 58 A.L.R.3d 12 (1974 & Supp.1994); Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 Neb.L.Rev. 415 (1971).

Shelter relies on a number of cases construing similar exclusions for the proposition that the installation was complete. Among those are *Standard Acc. Ins. Co. v. Roberts,* 132 F.2d 794 (8th Cir.1942) and *Dixie Furniture Co. v. Central Surety & Insurance Co.,* 173 F.Supp. 862 (E.D.Ark.1959), *aff'd,* 272 F.2d 190 (8th Cir.1959).

The *Standard Accident* case involved the sale and installation of a gas operated refrigerator. Roberts sold the refrigerator and installed it by coupling the refrigerator to the gas pipes in the home. *Id.* at 796. The following evening the resident's wife and children were injured by gas escaping from the refrigerator connections. The court found no coverage and noted that the installation had been completed and the refrigerator turned over to the residents before the accident occurred. *Id.* at 796–97.

The *Dixie Furniture* case involved the repossession of a butane stove. It was alleged that during repossession the individual repossessing the stove failed to properly cap the gas pipe. Several days later an explosion occurred. The court concluded the policy at issue provided no coverage because the accident arose from a completed operation. In so holding the court stated:

> Granting that the repossession of the stove in question was an operation necessary or incidental to the plaintiff's carrying on of business, and granting further that the negligence of the plaintiff's employee in the course of his repossession of the stove laid the train for the accident that later, the plaintiff cannot escape the fact that the accident did not occur until after the repossession had been completed or abandoned, and that it occurred on premises other than those described in the policy.

*Dixie Furniture,* 173 F.Supp. at 866.

In *Farm Bureau Mutual Ins. Co. v. Lyon,* 258 Ark. 802, 528 S.W.2d 932 (1975), the Arkansas Supreme Court addressed the applicability of a products-completed operations exclusion. It noted that some courts have given a broad sweep to this exclusion and that such a broad sweep was unwarranted upon consideration of the policy as a whole. *Id.,* 258 Ark. at 805, 528 S.W.2d 932. Under the facts of the case before them the court concluded the exclusion was inapplicable because the negligence which caused the accident occurred on the insured premises. *Id.,* 258 Ark. at 807, 528 S.W.2d 932.

The case of *Southwestern Bell Telephone Co. v. Travelers,* 252 Ark. 400, 479 S.W.2d 232 (1972) involved a contract to perform plowing, trenching work, and lay phone ground cables and wires. The contractor dug the trenches, laid the cables and wires, and backfilled the trenches. The machinery

was then removed from the construction site. The work was inspected by a construction supervisor who wrote on the contract that the work had been completed in a satisfactory manner. *Id.,* 252 Ark. at 401, 479 S.W.2d 232. The contractor was then paid in full.

About two months later a boy was injured when he tripped and fell because of a depression in the trench which resulted from the settling of backfill due to rainfall. Shortly thereafter the contractor shoveled sufficient dirt in the trench to cover the depression. *Id.* There was undisputed evidence that an oral understanding existed that the contractor following approval and payment of the project and upon notification would return to the construction site and refill any sunken trenches without additional pay. The parties had followed this procedure for a number of years. *Id.,* 252 Ark. at 402, 479 S.W.2d 232.

It was argued that the contract was not completed even though the main work project was completed. The trial court construed the policy as not providing coverage and the Arkansas Supreme Court affirmed. The court stated:

> Certainly, the appellant had accepted the main work project as being satisfactorily completed; however, the appellant would construe the parenthetical clause, "other than service, maintenance, or repairs," to include these items or restoration work as an extension of the time element provided for in the policy. We cannot agree. In our view, there is no ambiguity in the exclusionary clause. The exclusionary clause clearly defines the extent of the work project or the time element and does not include the asserted coverage for restoration work following completion of the project. Also, we recognize the general rule that where there is a practical acceptance by a proprietor upon completion of its contractor's work thereupon the liability of the contractor to third persons ceases and the responsibility "for maintaining or using [it] in its defective condition [is] shifted to the proprietor."

*Id.,* 252 Ark. at 402–03, 479 S.W.2d 232 (citations omitted).

In general "[a] contract or operation is deemed completed when the work contracted for or undertaken has been finished, even though minor details of performance may remain." 12 Mark S. Rhodes, *Couch, Cyclopedia of Insurance Law* § 44A:24 at p. 43 (Rev.Ed.1981). There are, however, a line of cases which stand for the proposition that if a worker has omitted or altogether failed to perform some substantial requirement essential to the functioning or performance of the project that the project is not complete. *Id. See e.g., Charles v. LeBlanc,* 633 So.2d 866 (La.App. 3 Cir.1994) (completed operations hazard did not exclude coverage for omissions or failure to make representations); *Southern Guaranty Ins. Co. v. Jeffares,* 190 Ga.App. 449, 379 S.E.2d 167 (1989) (installation work on gas lines and air conditioning system not complete because installer unable to charge and test the unit which the court viewed as an essential element of the contract performance). Others have found that a negligent failure to warn claim does not fall within the exclusion. *See e.g., Devich v. Commercial Union Ins. Co.,* 867 F.Supp. 1230 (W.D.Pa.1994) (applying Pennsylvania law) (The court believed the exclusion applied to defective product claims rather than negligent failure to warn claims).

■ It is these cases that support the argument made by the defendants herein. That is, that the exclusion does not apply because all the work called for had not been completed prior to the accident. It is argued that all work by Bill Gardner which was necessary to make the liquified petroleum system safe for use for its intended purposes had not been completed prior to the explosion. There are cases in other jurisdictions that have concluded an operation is not complete when not performed properly. *See e.g., Chancler v. American Hdw. Mut. Ins. Co.,* 109 Idaho 841, 712 P.2d 542 (1985); *United States Fidelity & Guaranty v. Nat. Tank & Machine Works,* 402 So.2d 925 (Ala.1981); *Woodard v. North Carolina Farm Bureau Mutual Ins. Co.,* 44 N.C.App. 282, 261 S.E.2d 43 (1979).

A number of courts have rejected the theory that the insurer would remain liable indefinitely for defective workmanship because defective work is never complete until the defect is discovered and corrected. *See e.g.,*

*Berger Bros. Electric Motors, Inc. v. New Amsterdam Casualty Co.*, 293 N.Y. 523, 58 N.E.2d 717 (1944) (electrical fans installed backwards causing damage to turkeys). It has been pointed out that the cases holding the completed operations hazard inapplicable unless the object of the operation is capable of serving its purpose without defect, ignore the deemed to be completed language of such exclusions. *See Boyer Metal Fab, Inc. v. Maryland Casualty Company*, 90 Or.App. 103, 750 P.2d 1195 (1988). However, if the work to be performed involves a course of continuing conduct the project will not be regarded as complete. *See e.g., Lumbermens Mutual Cas. Co. v. Pound Ridge*, 362 F.2d 430 (2d Cir.1966) (obligation to keep streets clear of expected snow and ice accumulations).

We believe the line of cases holding that an operation is not complete as long as any portion of the work is defective or improperly installed cannot be applied to the case at hand. When the court considers the policy language and the circumstances at issue herein, we believe there is no question but that the explosion and fire occurred at a time after the insured had completed his work on the Aitkens' house within the meaning of the policy. It is undisputed that Gardner had no continuing obligations or duties under the terms of his contract. The explosion and fire are alleged to have been proximately caused by a defect or other failure occurring in the LP gas lines installed by Gardner. The lines had been put to their intended use for a period exceeding one year prior to the fire and the explosion. There is no evidence that anyone considered that there were yet operations to be performed by or on behalf of the named insured. As such, any damages resulting therefrom are the result of a completed operation. Subsequent servicing and adjustment of the otherwise completed system did not render the operation incomplete under the language of the policy. *See e.g., St. Paul Ins. Co. v. Bischoff*, 150 Mich.App. 609, 389 N.W.2d 443 (1986) (security alarm system suffered numerous false alarms between the date of installation and date of the occurrence—installer called back twice to cure the problem).

■ To the extent defendants seek to establish coverage under the policy for a negligent act equated with the failure to warn or instruct or a representation that the system was safe for its intended use, we reject that argument. As was noted in *American States Ins. Co. v. Aetna Life & Cas. Co.*, 177 Ind. App. 299, 379 N.E.2d 510 (1978), "[c]ourts are reluctant to consider as a separate operation a representation closely related to a sale or service." *Id.*, 177 Ind.App. 299, 379 N.E.2d at 514. "Other courts have recognized that most accidents (which lead to lawsuits) can be traced to some preexisting negligence. Extension of coverage to all such accident would render a Products Hazard exclusion meaningless in many cases in which an insured recommends or makes representations about his products or services, or fails to warn of potential dangers." *Id.*, 379 N.E.2d at 515.

When the exclusion at issue is considered in conjunction with the applicable definitions, it is clear that the exclusion encompasses more than accidents caused by the product or operation of the product. Specifically, the exclusion encompasses negligent acts such as failure to instruct or warn and misrepresentations arising in connection with the contractor's performance. The term "your work" is defined to include any warranties or representations as well as the failure to provide warnings or instructions. The "products-completed operations hazard" includes, as completed, any operation on which all work called for in the contract was completed or when the work has been put to its intended use. Also included, as completed, is work that "may need service, maintenance, correction, repair or replacement." *See e.g., American States*, 379 N.E.2d at 516–17.

■ We also reject defendants' argument that Gardner's failure to respond to the Aitkens call regarding a leak in the fireplace valve in May of 1993 constitutes a wholly separate insurable event. The definition of "your work" includes the following language: "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." The leak or faulty valve, if one existed, existed because of the work per-

formed earlier and any service call was related to the original work.

A plumber who had no prior connection to the work clearly would have had no legal duty to respond to the Aitkens' May, 1993, request for a service call, so any duty Gardner had to respond was obviously connected to the work he had done more than a year before, and, any such duty was caused by his alleged negligence at that time. Thus, if Gardner was negligent or otherwise liable for not responding to the call, it was because he breached a duty to repair defective work performed and "completed" months before, and accepted by the contractor and the Aitkens and used by them for almost two years. The "completed operations exclusion" clearly excludes coverage for such acts or failure to act.

Even if the court concluded the May, 1993, request for service constituted a discreet insurable event, we would not find coverage existed. Assuming this is a separate insurable event and thus a separate operation, we believe Shelter is right when it asserts the "work" or omission was complete prior to October of 1993. There is no indication that the gas lines were not being used during the intervening months or that any further effort was made to obtain service. If Gardner had gone to the home in May of 1993, performed a repair and then left, we would have no hesitation in holding that the service fell within the products-completed operations hazard. What defendants in effect ask us to hold is that because he failed to perform the May, 1993, service, coverage is extended indefinitely. We decline to do so. Whether the lines were defective within the meaning of the law or whether Gardner was negligent in failing to provide adequate warnings or in failing to respond to the May, 1993, call are matters to be determined by another court at another time. We are simply holding that the contract entered into between Gardner and Shelter does not, by its terms, provide coverage for the acts or failure to act of Gardner and nothing more.

### Conclusion.

We conclude coverage extends only to Gardner's operations that are in progress and the operation in question was completed prior to the time of the occurrence at issue. Therefore, coverage was excluded under the completed operations hazard exclusion. As there exists no possibility of coverage, we conclude there is no duty to defend.