**PHILADELPHIA INDEMNITY INSURANCE COMPANY, Plaintiff,**

v.

**CARCO RENTALS, INC., d/b/a Hertz Rent-a-Car, Licensee, Defendant,**

**Reliance Insurance Company, Intervenor.**

Civil No. 95–2141.

United States District Court, W.D. Arkansas, Fort Smith Division.

April 16, 1996.

Beverly A. Rowlett, Huckabay, Munson, Rowlett & Tilley, Little Rock, AR, James E. Green, Jr., Lipe, Green, Paschal, Trump & Bragg, Tulsa, OK, for plaintiff.

James M. Dunn, Warner & Smith, Fort Smith, AR, for Campbell Hardage.

Ben T. Barry, Pryor, Barry, Smith, Karber & Alford, Fort Smith, AR, for Carco.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is an action for declaratory judgment filed by Philadelphia Indemnity Insurance Company (hereinafter Philadelphia). Philadelphia seeks a declaration that there is no duty to defend and no coverage under the policy at issue for any injuries sustained or death resulting from an automobile accident that occurred on September 10, 1994. The case is currently before the court on cross-motions for summary judgment filed by Philadelphia and by Reliance Insurance Company (hereinafter Reliance).[1] The facts underlying the current dispute are essentially undisputed.

*Summary Judgment Standard.*

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed.R.Civ.P. 56. The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied.

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also AgriStor Leasing v. Farrow,* 826 F.2d 732 (8th Cir.1987); *Niagara of Wisconsin Paper Corp. v. Paper Industry Union—Management Pension Fund,* 800 F.2d 742, 746 (8th Cir.1986).

The Eighth Circuit Court of Appeals has advised trial courts that summary judgments should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States,* 600 F.2d 725 (8th Cir.1979), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420 (1979). In *Counts v. MK–Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988), the court, reviewing the burdens of the respective parties, stated:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.,* '[to] point[ ] out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific

---

1. During the course of this litigation a number of parties have been dismissed.

facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339, *quoting, City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir.1988) (citations omitted) (brackets in original).

However, the Court of Appeals for this circuit has also held that the court, in ruling on the motion for summary judgment, must give the non-moving party "the benefit of the reasonable inferences that can be drawn from the underlying facts." *Fischer v. NWA, Inc.*, 883 F.2d 594, 598 (8th Cir.1989) (*citing Trnka v. Elanco Products Co.*, 709 F.2d 1223 (8th Cir.1983), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990).

*Background.*

On September 10, 1994, Neil Nash (Nash), an employee of Campbell Hardage, Inc., flew to Ft. Smith, Arkansas. When he arrived in Ft. Smith, Nash rented a car from Carco Carriage Corporation d/b/a Hertz Rent-a-Car (hereinafter Carco). Nash was traveling on business to Wortz Biscuit Company in Poteau, Oklahoma, to work on machinery.

Carco maintained on its rental cars the minimum statutorily mandated liability limits required by the states in which it operated. This basic liability protection was provided through National Casualty Company. Carco also made available to its customers for a specified purchase price supplemental liability insurance (referred to as SLI or LIS coverage). The supplemental liability insurance coverage contained $1,000,000 limits. In actuality, the amount of coverage was the difference between the dollar amount of the coverage provided by the basic policy, the minimum statutory limits in the given state, and $1,000,000. Carco also offered its rental customers a loss damage waiver (LDW), personal accident insurance (PAI), and a fuel option.

The supplemental liability insurance was provided by Philadelphia through an ar-rangement with Fact, Inc. Fact, Inc., is a trade association of Hertz franchisees and is listed as the policyholder.[2] However, under the terms of the policy only the rental customers purchasing the supplemental coverage were insureds. Carco is a member of Fact, Inc. Philadelphia submitted the SLI policy to the Arkansas State Insurance Commission for review and approval prior to September 10, 1994. The actual approval did not occur until September 18, 1994.

Customers were made aware of the availability of this supplemental insurance as part of the rental process. Specifically, Carco rental agents were trained to ask customers whether they wanted to obtain additional or supplemental liability protection.

Philadelphia provided training to Hertz franchisees' counter personnel regarding the solicitation of the sale of supplemental liability insurance to Hertz customers. Such training was conducted in Ft. Smith, on July 12, 1994. As part of the training, Philadelphia provided workbooks regarding the insurance.

In accordance with this practice, Tracie Johnston, the Carco rental agent working on September 10, 1994, indicates it was her procedure to hand the customer the pamphlet on the insurance when she asked the customer if he wanted the additional insurance. Her normal procedure was to open the pamphlet and read along with the customer.

The pamphlet entitled "Liability Insurance Supplement" describes the insurance as "excess automobile liability insurance" which provides coverage "for claims made by third parties for bodily injury and property damage caused by the use of a rental vehicle as permitted by the terms of the Rental Agreement." Under the caption "How Does LIS Affect Your Own Automobile Insurance," the pamphlet indicates the "liability protection provided by the Rental Agreement together with LIS is primary, so your own automobile insurance policy will not be called on to contribute unless and until the liability pro-

---

**2.** Pursuant to policy change number 1, effective on September 1, 1994, the "policy holder" included member licensees of Fact, Inc., who had elected to participate in the supplemental liability insurance program.

tection provided by the Rental Agreement and LIS is exhausted or does not apply."

Under the caption "What Exclusions Apply to LIS?," the pamphlet states

The program contains exclusions. All exclusions can be found in the excess automobile liability insurance policies. Example copies of the policies are available upon request at all participating locations. Some of the LIS exclusions are the same as those found in most automobile liability insurance policies. The following additional exclusions are brought to your attention since they are not customarily found in automobile insurance policies, but are contained in the excess automobile insurance liability policies, and therefore in LIS:

1. There is no protection if you or any Authorized Driver use or permit the use of the rental vehicle in violation of the terms of the Rental Agreement.

The customer must either decline or accept the additional coverage. The rental agent then makes a computerized notation on the rental record of the acceptance or denial. The rental agent also enters information from the customer's driver license and credit card prior to printing the rental record. The rental record from Nash's rental was printed at 10:54 a.m. on September 10, 1994.

The rental record is a one page computer generated document which contains the above indicated information as well as information regarding the rate charged and the vehicle rented. The rental record contains a place for the customer to initial and sign the document. The customer signs the rental record below a statement, in all capital letters, which indicates in part that by "signing this agreement you agree and understand the above and all terms, conditions and your obligations shown on the folder (LGN1900005) delivered to you with this rental record."

In accordance with this practice, the rental agent, Tracie Johnston, asked Nash whether he wanted to purchase supplemental liability insurance. Nash indicated he did. When he opted to purchase this coverage he was enrolled as an insured.

There is no indication that Nash asked to see a copy of the supplemental insurance policy. If he had made such a request, the Ft. Smith rental office did not have a copy although Carco's Fayetteville office did have a laminated copy of the policy. Carco as a Fact, Inc., member had specifically agreed to provide specimen copies of the supplemental liability insurance coverage at every counter.

Once the rental record was signed and initialled by Nash, Ms. Johnston folded it and placed it and the pamphlet describing the supplemental liability insurance inside a jacket or folder that contained the terms and conditions of the rental and gave these items to Nash. In addition to containing the terms and conditions or the rental, the jacket contains spaces to record the stall, license number, model, etc., regarding the car, has toll free numbers, return information, information regarding the Hertz # 1 Club Gold, and other Hertz services.

The terms and conditions of rental which are contained on the jacket or folder are generally not handed to the customer until after the rental transaction has been completed. Ms. Johnston had never seen a customer read the entire Hertz jacket prior to signing the rental record.

It was the policy of Carco and Hertz to require rental personnel to evaluate potential renters for signs of intoxication. The policy prohibited rental of vehicles to intoxicated customers. Ms. Johnston observed nothing unusual in Nash's mannerisms, did not smell an odor of alcohol on him, and did not notice anything unusual in his walk when she rented him the car and sold him the supplemental insurance coverage.

The rental agreement terms or conditions consists of fourteen numbered paragraphs that are set forth on the inside of the jacket or folder. Paragraph number 5 of the terms and conditions describes prohibited uses of the car. The wording of paragraph number 3 (your responsibilities), paragraph number 4 (responsibility for loss of or damage to the car) and number 5 (prohibited uses of the car) is set off in a box and all letters are capitalized.

Paragraph number 5 provides in part:

ANY USE OF THE CAR AS PROHIBIT-ED BELOW WILL BREACH THIS AGREEMENT, WILL VOID ANY LIMITATION OF YOUR RESPONSIBILITY UNDER PARAGRAPH 4, AND WILL MAKE YOU FULLY RESPONSIBLE FOR HERTZ' ACTUAL AND CONSEQUENTIAL DAMAGES, COSTS AND ATTORNEY'S FEES RESULTING FROM THAT BREACH. TO THE EXTENT PERMITTED BY LAW, LDW, PAI AND PEC, LIS AND ALL LIABILITY PROTECTION UNDER THIS AGREEMENT WILL ALSO BE VOID. *UNDER THIS AGREEMENT YOU AND/OR ANY AUTHORIZED OPERATOR MAY NOT:*

(e) USE OR PERMIT THE USE OF THE CAR BY ANYONE:

 (1) UNDER THE INFLUENCE OF ALCOHOL OR DRUGS;

At approximately 11:45 a.m. on September 10, 1994, the rental car driven by Nash crossed the center line on State Highway 112 near Cameron, Oklahoma, and struck a car being driven in the opposite direction by Betty Wallis. Ms. Wallis' grandson, Skylar Wallis, age 4, was a passenger in Mrs. Wallis' car. As a result of injuries sustained in the accident both Nash and Skylar Wallis died.

The trooper who arrived at the scene of the accident, observed that Nash had a strong odor of intoxicants about his person. Nash was taken to the hospital and arrived there at approximately 12:00 noon. A blood sample was taken at about 1:00 p.m. The nurse who drew the blood sample noticed a strong odor of alcohol about Nash's person. The blood alcohol test conducted revealed a blood alcohol level of .26 [3] after the accident at issue. A blood alcohol content of .26 is considered legally intoxicated in the State of Oklahoma.

As a result of the injuries and death, Greg and Sherri Wallis, the parents of Skylar Wallis, and Betty Wallis filed suit in the Eastern District of Oklahoma on December 30, 1994, against Campbell Hardage and Carco. Reliance was the liability insurance carrier for

Campbell Hardage. Carco brought a third party complaint against Nash's estate. It was alleged that Nash was operating the rental car while he was under the influence of alcohol or was legally intoxicated. Although Philadelphia was not party to the lawsuit, Nash's estate had demanded both a defense and indemnity from Philadelphia. Philadelphia declined to provide a defense.

The Estate of Neil Nash, deceased, and Wanda Nash, executrix of the Estate of Neil Nash, Campbell Hardage, and their respective insurers, including Reliance, Allstate Insurance Company, and National Casualty Company, settled with Greg Wallis, Sherri Wallis and Betty Wallis after the start of the jury trial. The total settlement was $2.85 million, paid as follows: $1,000,000 paid by Reliance as liability insurance carrier for Campbell Hardage; $1,710,000 paid by Reliance as excess liability insurance carrier for Campbell Hardage; $100,000 paid by Allstate Insurance Company as liability insurance carrier for Neil Nash; and $40,000 paid by National Casualty Company as liability insurance carrier for Carco by virtue of the existence of the rental agreement between Nash and Carco.

The case proceeded to jury trial against Carco. A jury verdict was rendered in favor of Greg and Sherri Wallis in the amount of $36,274.14 and in favor of Betty Wallis in the amount of $143,708.23. The case was submitted to the jury on the theory of negligent entrustment.

Philadelphia became aware of the filing of the Oklahoma suit in January of 1995. Its counsel attended two settlement conferences in the case and attended the deposition of the plaintiffs' blood-alcohol expert.

The policy, initially issued to Fact, Inc., on September 1, 1993, with a policy period through September 1, 1994, contained the following text under the heading "EXCLUSIONS:"

In addition to the exclusions contained in the Underlying Insurance, the following additional exclusions shall apply:

**3.** The result of the analysis showed 0.26 grams of ethyl alcohol per 100 milliliters of blood. The administration of any IV fluids prior to the blood sample having been drawn would have diluted the alcohol content in the blood.

1. Liability arising out of the use of a covered automobile in violation of the conditions of the rental contract.

The policy also contained policy change number 2 which provided in part as follows:

This endorsement modifies insurance provided under the following: Rental Supplemental Liability Insurance Excess Policy.

Exclusion No. 1 is deleted and replaced as follows:

(1) Liability arising out of the use of a covered auto in a manner which violates the terms of the Rental Agreement. Such violations shall include, but are not limited, to the following:

Use of the covered auto:

(1) while legally intoxicated or under the influence of drugs or other substances which would impair driving ability....

The policy change showed an effective date of September 1, 1993.

The policy was renewed for the period September 1, 1994, through September 1, 1995. Like the original policy, the renewal policy contained in the main body of the policy an exclusion for liability arising out of the use of a covered automobile in violation of the conditions of the rental contract. The renewal policy also contained an endorsement, endorsement number three which provided:

Exclusion Number 1 is deleted and replaced as follows:

1) Liability arising out of the use of a covered auto in a manner which violates the terms or use restrictions of the Rental Agreement. Such violations shall include, but are not limited, to the following:

Use of the covered auto:

(1) while legally intoxicated or under the influence of drugs or other substances which would impair driving ability....

The endorsement contained a statement indicating it was effective September 1, 1994. The date of issue of the endorsement was October 4, 1994. The only document Carco had at its Ft. Smith location which contained any term, condition, or restriction concerning the use of a rental car by a driver while under the influence of alcohol was the pro-

hibited uses information contained on the Hertz jacket.

*General Rules of Construction.*

"[P]arties are free to make contracts based on whatever terms and conditions they agree upon, provided it is not illegal or tainted with some infirmity such as fraud, overreaching or the like." *Hancock v. Tri–State Ins. Co.,* 43 Ark.App. 47, 50, 858 S.W.2d 152 (1993). "It is the duty of courts to enforce contracts as they are written and in accordance with the ordinary meaning of the language used and the overall intent and purpose of the parties." *Id.* 43 Ark.App. at 51, 858 S.W.2d 152. The law is well-settled that a policy of insurance is nothing more than a contract between the insurance carrier and its insured, and is to be governed by the ordinary rules of interpretation of a contract. *Perkins v. Clinton State Bank,* 593 F.2d 327 (8th Cir.1979); *Tri–State Ins. Co. v. Sing,* 41 Ark.App. 142, 850 S.W.2d 6 (1993).

A common sense approach should be used and generally the words employed in the policy are to be construed in their plain, ordinary, and popular sense. *Wommack v. United States Fire Ins., Co.,* 323 F.Supp. 981 (W.D.Ark.1971); *Tri–State Ins. Co. v. Sing,* 41 Ark.App. 142, 145, 850 S.W.2d 6 (1993). "[U]ndefined terms of an insurance policy ... must be construed in their plain, ordinary and everyday sense and the parameters of the definition should reflect the legal characteristics most frequently attributed to the word." *Eagle Star Insurance Co. v. Deal,* 474 F.2d 1216, 1220 (8th Cir.1973). "Such guidelines suggest that economic reality and substance, rather than legalistic form, should be determinative of the word's meaning." *Id.*

It has been stated:

Contracts of insurance should receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties in the light of their general object and purpose. The terms of an insurance contract are not to be rewritten under the rule of strict construction against an insurer so as to bind the insurer to a risk which is plainly excluded and for which it was not paid.

*Id.* (citations omitted). "If some ambiguity creeps in, the interpreting court must first seek resolution within the wording of the instrument before resort to extraneous information is used." *Hancock v. Tri–State Ins. Co.*, 43 Ark.App. 47, 858 S.W.2d 152 (1993). Courts are required to "strictly interpret exclusions to insurance coverage and to resolve all reasonable doubts in favor of the insured who had no part in preparation of the contract." *Security Insurance Co. v. Owen*, 252 Ark. 720, 725, 480 S.W.2d 558 (1972).

The Arkansas Court of Appeals has recently summarized the existence of a duty to defend in the following terms:

> As a general rule, the pleadings against the insured determine the insurer's duty to defend. The duty to defend is broader than the duty to pay damages and the duty to defend arises where there is a possibility that the injury or damage may fall within the policy coverage.

*Tri–State Ins. Co. v. Sing*, 41 Ark.App. 142, 144, 850 S.W.2d 6 (1993). The court must, therefore, determine if a possibility of coverage exists, under the terms of the policy at issue. *Id. See also Home Indem. Co. v. City of Marianna*, 291 Ark. 610, 618, 727 S.W.2d 375 (1987).

*Discussion.*

Reliance contends the exclusionary language is ineffective for a number of reasons.[4] First, Reliance argues the purported exclusion of coverage for renters who are driving while intoxicated violates the public policy of the State of Arkansas. Second, Reliance argues that any attempt by Philadelphia to exclude coverage to Nash while driving while intoxicated is deceptive and misleading and therefore unenforceable. Third, Reliance argues Philadelphia is estopped from denying

coverage because its agent, Carco, knew or should have known that it sold supplemental liability insurance to an intoxicated person and cannot deny coverage.

Reliance also argues endorsement # 3 was not in effect on the day of the accident. This argument is based on the fact that the issue date indicated on the endorsement is October 4, 1994, and on the fact that the renewal policy and its endorsements were not sent to Carco or Fact prior to the date of the accident.

However as Philadelphia points out, the declarations page indicates the renewal policy period was from September 1, 1994, to September 1, 1995. The declarations page also indicates that the applicable endorsements included # 1, # 2, and # 3. Endorsement # 3 contains a statement that it becomes effective on September 1, 1994.

Furthermore even if the court would find that endorsement # 3 was not effective, endorsement 2, which contained identical provisions was part of the original policy, and was in effect during the entire policy period between September 1, 1993, and September 1, 1994. Thus assuming the terms of the renewal policy and its endorsements were not effective until received by Fact or Carco, no argument has been made that the terms of the original policy did not remain in effect during this period. Additionally both the original and the renewal policy, under the heading exclusions, excluded coverage for any liability arising out of the use of a covered automobile in violation of the conditions of the rental contract. Therefore even if the endorsements were not in effect for some reason, Philadelphia is free to argue that there would still be no coverage as the rental agreement clearly prohibited use of the vehi-

---

**4.** Interestingly, Reliance is forced to assert a position in this case that might well serve as precedential value in a similar case against it. Reliance also issues rental car supplemental excess automobile liability policies to Hertz Corporation. Its policy exclusion section also incorporates by reference the use prohibitions from the Hertz rental agreement.

Philadelphia contends that Reliance should be judicially estopped from arguing in this case the intoxication exclusion violates public policy or is otherwise void when Reliance itself issues SLI

coverage containing the same exclusion. We do not believe this is an appropriate case for the imposition of judicial estoppel. This is not a case where the judicial forum or process has been abused. *See e.g., Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n. 6 (8th Cir.1987); *AFN, Inc. v. Schlott, Inc.*, 798 F.Supp. 219, 223–24 (D.N.J.1992). However depending upon the court's decision herein, the doctrine may well apply to prevent Reliance from taking a contrary position in subsequent litigation. *Id.*

cle by an operator under the influence of alcohol.

### (1). *Public Policy.*

▮ Reliance asks this court to find the exclusion to be void as against public policy in light of public policy recognized by the Arkansas Supreme Court and the Arkansas legislature to provide compensation to innocent victims of car accidents. The gist of Reliance's argument is the exclusion is against public policy because it punishes the innocent victims of drunk drivers, and not the drunk drivers, by nullifying liability coverage which would otherwise compensate the victims. *See e.g., Hertz Corp. v. Garrott,* 238 Ill.App.3d 231, 179 Ill.Dec. 387, 606 N.E.2d 219 (1992) (exclusionary clause in Hertz rental agreement which voided the liability protection and insurance provisions based upon the prohibited use of the vehicle is void as against public policy).

The Arkansas courts have not yet addressed this type of exclusion in the context of rental car excess insurance or other policies of automobile liability insurance. *Cf., McGarrah v. Southwestern Glass Co.,* 41 Ark.App. 215, 852 S.W.2d 328 (1993) (intoxication exclusion in health insurance plan). However, the Arkansas courts have on numerous occasions been asked to declare insurance contracts to be illegal or void as against public policy. The Arkansas Supreme Court has stated that "[a]n insurer may contract with its insured upon whatever terms the parties may agree which are not contrary to statute or public policy." *Shelter General Ins. Co. v. Williams,* 315 Ark. 409, 412, 867 S.W.2d 457 (1994); *Guaranty Nat'l Ins. Co. v. Denver Roller, Inc.,* 313 Ark. 128, 138, 854 S.W.2d 312 (1993) (citations omitted).

In an early case *Hultsman v. Carroll,* 177 Ark. 432, 6 S.W.2d 551 (1928), the court "declared the general rule that a contract is against public policy if it is injurious to the interests of the public, or contravenes some established interest of society or some public statute, or is against good morals, or tends to interfere with the public welfare." *Guaranty Nat'l,* 313 Ark. at 138, 854 S.W.2d 312. More recently, the Arkansas Supreme Court has held that "the public policy of this state is found in its constitutional and statutes." *Guaranty Nat'l,* 313 Ark. at 139, 854 S.W.2d 312 (citations omitted).

As Philadelphia points out, there are no Arkansas statutes which preclude an exclusion for coverage in an excess liability policy when the driver of the vehicle is intoxicated. In fact, Philadelphia argues the public policy abhors the operation of a motor vehicle while one is intoxicated. For this reason, Philadelphia argues the policy provision is in furtherance of public policy rather than in contravention thereto.

Reliance argues that Arkansas' public policy as exhibited by its financial responsibility act prohibits the exclusion and exhibits a strong policy in favor of providing monetary compensation for persons injured by negligent, or in this case intoxicated, drivers. Philadelphia concedes that similar exclusions have been found to be void when the provision excludes coverage under a policy issued to satisfy a state's minimum financial responsibility or compulsory insurance law. *See e.g., Allstate Ins. Co. v. Sullivan,* 643 S.W.2d 21 (Mo.Ct.App.1982); *Donegal Mut. Ins. Co. v. Long,* 387 Pa.Super. 574, 564 A.2d 937 (1982), *aff'd,* 528 Pa. 295, 597 A.2d 1124 (1991). *Cf. Hertz Corp. v. Garrott,* 238 Ill. App.3d 231, 179 Ill.Dec. 387, 606 N.E.2d 219 (1992) (exclusionary clause in Hertz rental agreement which voided liability protection and insurance provisions based upon prohibited use of the vehicle is void—court refused to substitute Hertz's statutory obligation to provide minimum liability insurance coverage required by law in place of contractual provision disclaiming all liability protection). However, in this case the provision excludes only excess coverage. The minimum coverage required by the state was in place and was unaffected by the exclusion.

In support of its argument that the exclusion does not violate public policy, Philadelphia has provided the court with the affidavit of Robert Ridgeway, Assistant Insurance Commissioner for the State of Arkansas. The affidavit indicates the form submitted by Philadelphia in June of 1994 was approved by

the Arkansas Insurance Department on September 18, 1994. The approved form included the endorsement which excluded coverage for any use of the vehicle while legally intoxicated.

Mr. Ridgeway states "[t]he policy form, including the above exclusion, was approved, and would not have been approved by the Insurance Department if it had been determined that it was inconsistent with the public policy of the state of Arkansas."[5] Mr. Ridgeway opines that as the exclusion is contained in an excess policy "it is a matter of private contract between the insurance company and the insured." Mr. Ridgeway also notes that the applicable Arkansas statute did not require Philadelphia to submit the policy forms. Despite this, Philadelphia did submit the forms and the insurance department approved them.

Philadelphia cites the court to the case of *Public Employees Mutual Ins. Co. v. Hertz Corp.*, 59 Wash.App. 641, 800 P.2d 831 (1990) where a prohibited use provision in Hertz rental contract was upheld. In that case Rodney Dillaman rented an automobile from Hertz. The Hertz rental carried with it automatic liability insurance for accidents which occurred while the car was being used as permitted by the agreement. *Id.* The agreement contained a prohibited use section which included use by anyone under the influence of alcohol. Dillaman was intoxicated when he was involved in an accident while driving the rental car. Dillaman's personal insurer, PEMCO, filed a declaratory judgment action against Hertz alleging that the liability insurance provided by the Hertz agreement covered the accident and that PEMCO's policy provided only excess coverage.

The Washington Court of Appeals held that the policy of the Washington financial responsibility act did not bar the prohibited use clause because the clause related directly to an increased risk on the part of the insurer. *Id.*, 800 P.2d at 832. It noted the exclusions it found to be violative of public policy

were those manifesting no relation to any increased risk faced by the insurer, or when innocent victims have been denied coverage for no good reason. *Id.*

PEMCO also argued that the prohibited use clause should be declared procedurally unconscionable. Substantive unconscionability was said to involve those cases where a clause or term in the contract is alleged to be one-sided or overly harsh. The question of substantive unconscionability was subsumed in the court's public policy discussion. *Id.*, 800 P.2d at 833 n. 2. Procedural unconscionability related to impropriety during the process of forming the contract and was described as a lack of "meaningful choice." *Id.*, 800 P.2d at 833.

In applying this doctrine of unconscionability the following factors were considered: (1) the use of a standardized contract between parties of unequal bargaining power; (2) the existence of a lack of opportunity to become familiar with terms before signing; (3) the use of fine print in the particular clause; (4) the absence of evidence that the provision was commercially reasonable or reasonably anticipated; (5) unfair terms; (6) the relationship of the parties including assent, unfair surprise and notice, and (7) the overall circumstances of the contract. *Id.*, 800 P.2d at 834, *citing, Davis v. M.L.G. Corp.*, 712 P.2d 985 (Colo.1986).

The Washington Court of Appeals upheld the prohibited use clause in the Hertz contract against the unconscionability attack based on a number of factors. In summarizing its holding the court stated:

> While this was a standardized contract between parties of unequal bargaining power, no evidence showed that Dillaman lacked opportunity to become familiar with the terms. Certainly there is no contention here that he was forced or rushed to sign. Further, the face of the Agreement calls attention to its essential terms and there was no use of fine print. It appears to this court that all of the essential provisions are in a similarly sized type face with many

---

5. Reliance argues that the affidavit may not be considered by the court as it merely sets forth legal conclusions. The court agrees that Mr. Ridgeway's opinion on whether or not the exclu-

sion is against public policy is in no way binding upon the court. This is a conclusion that must be drawn by the court.

printed in all capital letters. We believe that it is commercially reasonable for a car rental company to prohibit the use of its vehicles by an intoxicated driver. Not only is such a provision quite different in kind from a prohibition on mere negligent driving, but it should be anticipated in any jurisdiction, such as this one, with strong policies and penalties prohibiting driving while under the influence. The terms of this Agreement are not unfair. As to the relationship of the parties, if a driver does not assent all he need do is provide his own liability insurance (now required by law in this state). A prospective renter of a Hertz vehicle is not faced with a take it or leave it choice with regard to renting a vehicle. He can rent the vehicle and comply with one of the most important rules of the road in Washington: refrain from driving while intoxicated, or he can rent the vehicle but procure his own insurance with respect to liability to third parties. These are not unfair choices and are not unfair restrictions.

*Id.,* 800 P.2d at 835–36 (citation and footnote omitted).

We find this reasoning persuasive. We do not believe the Arkansas courts would find the exclusion at issue to be violative of the public policy of the State of Arkansas. The supplemental liability coverage is purely voluntary and is not designed to comply with minimum financial responsibility laws. The requirements of minimum financial responsibility were fulfilled by Carco through the National Casualty policy. The exclusion at issue in this case is operative only above minimum statutory limits.

■ The cases cited by Reliance which dealt with policies and/or rental agreements which excluded coverage for any negligent conduct are not persuasive. The exclusion is obviously much broader than that at issue herein and rendered the applicable coverage illusory. Nor do we find the cases dealing with such exclusions as applied to statutorily mandated minimum levels of insurance per-

suasive. *See e.g., Ryan v. Boyd,* 911 F.Supp. 524 (M.D.Ga.1996) (Budget's use restriction against driving while intoxicated is invalid as against the public policy that minimum statutory coverage be available in all instances for the benefit of innocent persons). *See also Cotton States Mut. Ins. Co. v. Neese,* 254 Ga. 335, 329 S.E.2d 136, 142 (1985) (compulsory insurance law does not establish public policy as to sums greater than those required by such law).

Finally, we do not believe it is the court's place to prevent the parties to a contract from including an exclusionary clause which has the affect of punishing antisocial conduct. In the case of *Hertz Corp. v. Garrott,* 238 Ill.App.3d 231, 179 Ill.Dec. 387, 606 N.E.2d 219 (1992) the court took such a task upon itself. The court stated:

> So, too, in this case, we believe that Hertz, a private entity, does not have the ability to separately impose sanctions upon private citizens for driving while intoxicated, in the name of the public policy, when such sanctions work a hardship upon the general public and, at the same time, benefit the rental agents and/or its insurer.

*Id.,* 238 Ill.App.3d at 239, 179 Ill.Dec. 387, 606 N.E.2d 219.

We agree that the fixing of penalties for antisocial conduct is, in the first instance, a governmental responsibility through legislative response. However, we find nothing in the public policy of the State of Arkansas which prevents parties to a contract from "punishing" [6] certain types of conduct by prohibiting such conduct under the contract. Nor do we find anything in the law that prevents an insurance company from excluding coverage for certain types of perils even though the underlying conduct might also be punishable by law.

### (2). *Misleading or Deceptive Language.*

Next, Reliance argues that Philadelphia's attempt to exclude coverage under the driving while intoxicated exclusion is deceptive

**6.** The court doubts that, in fact, the purpose of the exclusion is to "punish." Obviously, drunk drivers are much greater insurance risks than sober ones. Clearly, an insurance carrier should have the right to contract with its insureds so as to protect itself from the acts of drivers as drunk as Nash obviously was.

and misleading as a matter of law or misrepresents the benefits, advantages, or conditions of the SLI policy. In support we are asked to consider the following: (1) an Oklahoma federal court jury has found that Philadelphia's agent, Carco, knew or should have known Nash was intoxicated; (2) Carco employees were trained by Philadelphia to emphasize the "Million Dollar Protection" without explaining the intoxication exclusion; (3) the Hertz jacket containing the prohibited uses section was not provided to Nash until after the purchase of SLI was concluded; (4) Carco knew its customers did not have time to read the jacket—no customer had ever read the entire jacket; (5) the LIS brochure handed to Nash provides that there is no protection for use in violation of the "Rental Agreement"—the rental record [7] signed by Nash contains no conditions or restrictions; (6) the sample policy was not available for inspection at the Ft. Smith location; (7) had the sample policy been available, it would not have specifically informed Nash about the intoxication exclusion but would have provided that there was no protection in the event the "rental contract" was violated; and (8) no customer had ever requested an opportunity to review the policy, a fact known to Carco. Despite all these facts, Reliance points out that no effort was made to inform Nash of the exclusion or to make the exclusion conspicuous.

Irrespective of whether Philadelphia had incorporated the intoxication exclusion into the master policy prior to September 10, 1994, Reliance contends Philadelphia failed to furnish a policy with the exclusionary language to Carco until after September 10, 1994. In fact, Reliance attaches a letter dated June 13, 1995, to Fact which attaches copies of the policy which began on September 1, 1994.

Reliance cites the court to various Arkansas statutes some of which it concedes are inapplicable to excess policies, Ark.Code Ann. §§ 23–79–109, 23–79–110, and others it concedes do not create private causes of action, Ark.Code Ann. § 23–66–201 *et seq.*, and to various cases for the proposition that the incorporation of the terms and provisions of

the rental agreement into the policy is invalid.

■ We reject Reliance's arguments that the prohibition of and exclusion for driving under the influence was misleading or deceptive. We agree with Philadelphia that the "rental agreement" consisted of the rental record and the rental folder. Nash was provided with both.

Arkansas has long adhered to the principle that it is the duty of the insured to educate himself concerning matters of insurance. *See e.g., Scott–Huff Insurance Agency v. Sandusky,* 318 Ark. 613, 887 S.W.2d 516 (1994). Had Nash taken the time to read the prohibited use section of the terms and conditions of rental, he would have known that driving while intoxicated was a prohibited use. Furthermore, Nash was given a brochure describing the SLI insurance and informing him that the liability coverage had various exclusions. This brochure specified that there was an exclusion for violations of the rental agreement. There is no evidence that Nash asked for any further information regarding the coverage, asked to see the policy, or made any attempt to understand the SLI coverage and the applicable exclusions. By signing the rental record Nash represented that he agreed with and understood the terms and conditions of rental as set forth on the rental folder. The rental folder advised him that any use of the vehicle as prohibited in the agreement would void, to the extent permitted by law, all liability protection including LIS coverage.

■ Nor do we believe there was a deceptive character to the language used which would have led Nash to believe he had broad liability coverage without regard to applicable exclusions. *See e.g., Davis v. M.L.G. Corp.,* 712 P.2d 985 (Colo.1986) (scope of physical damage waiver limited in an unconscionable manner when the waiver provision was voided because customer violated a provision in the contract prohibiting driving while intoxicated). While the average renter would have had to refer to both the rental terms and the brochure or policy to educate himself on the coverage exclusions, we do not

---

7. Reliance for obvious reasons refers to the document signed by Nash as the "rental agreement."

agree that this fact alone voids the exclusion. The contents of the brochure put Nash on notice that the liability policy contained exclusions not found in most automobile liability policies. One such exclusion was that "[t]here is no protection if you ... use ... the rental vehicle in violation of the Rental Agreement."

The terms of the rental agreement clearly prohibit use of the vehicle while intoxicated and advise the renter that such use voids the insurance coverage to the extent permitted by law. This is not a case where coverage is excluded for an expected and foreseeable use of the vehicle by the renter. Rather, coverage is excluded for damages caused by the renter's use of the vehicle in an intoxicated state. *See Hertz Corp. v. Home Ins. Co.,* 14 Cal.App.4th 1071, 18 Cal.Rptr.2d 267 (1993) (excess liability insurance policy's incorporation of prohibited use of the rental agreement was unambiguous and sufficiently clear to be enforceable).

(3). *Agency, Estoppel and Res Judicata/Collateral Estoppel.*

Reliance asserts what would ordinarily be two separate legal arguments based on types of estoppel. First, Reliance argues that under Arkansas law Ms. Johnston's knowledge is imputed to Philadelphia. Based on this imputed knowledge Reliance contends Philadelphia is estopped to deny coverage. Second, Reliance argues that Philadelphia is bound by the prior judicial determination that its agent, Carco, knew or should have known that Nash was intoxicated at the time he rented the car and purchased the supplemental liability insurance. In view of the fact Ms. Johnston maintained throughout the underlying tort litigation that she observed nothing unusual in Nash's behavior and did not believe he was intoxicated the two arguments converge. This is true because the "knowledge" Reliance seeks to impute is based on the jury's implicit finding that Carco's agent, Ms. Johnston, knew or should have known that Nash was intoxicated at the time she rented him the vehicle and sold him the insurance.

Whether knowledge is imputed under Arkansas law to Philadelphia because of the type of agency relationship Ms. Johnston had with Philadelphia or because Philadelphia is barred from relitigating the issue by virtue of res judicata or collateral estoppel principles, the result is the same—Philadelphia is prohibited from using Nash's intoxication to nullify coverage.

We turn first to the concept of imputed knowledge; that is, under certain circumstances the law operates to impute the knowledge of the insurance agent to the insurer. In this regard, Reliance argues that since the policy was issued with Carco's knowledge of Nash's intoxicated state Philadelphia through its agent's actions is estopped from asserting the known ground of invalidity, *i.e.,* intoxication. In support Reliance cites, among others, *Southern National Ins. Co. v. Heggie,* 206 Ark. 196, 174 S.W.2d 931 (1943) and *State Farm Mut. Auto. Ins. Co. v. Mid–Continent Cas. Co.,* 518 F.2d 292 (10th Cir.1975) (trial court concluded the intoxication exclusion was waived because Budget knew or should have known when it rented the car to Garton that he was under the influence of intoxicants).

Philadelphia argues that the Carco clerks do not possess the indicia of either general or soliciting agents. Instead, Philadelphia argues the clerks merely offer rental customers the opportunity to enroll into an existing policy. Even if Carco and its employees were soliciting agents, Philadelphia argues their knowledge is not imputed and they did not have the authority to waive policy terms. Moreover, Philadelphia argues that waiver is a voluntary and intentional relinquishment of a known right, and it is uncontroverted that the Carco rental clerk did not have **actual** knowledge of Nash's intoxication, if he was in fact intoxicated at the time of the rental.

In *Dodds v. Hanover Ins. Co.,* 317 Ark. 563, 880 S.W.2d 311 (1994) the court set forth the distinctions between a general and a soliciting agent. The court stated:

A general agent is ordinarily authorized to accept risks, to agree upon the terms of insurance contracts, to issue and renew policies, and to change or modify the terms of existing contracts. A soliciting agent is ordinarily authorized to sell insurance, to receive applications and forward them to

the company or its general agent, to deliver policies when issued and to collect premiums. In addition, a soliciting agent has no authority to agree upon the terms of the policies or to change or waive those terms, nor can his knowledge be imputed to the company he represents.

*Id.,* 317 Ark. at 569–70, 880 S.W.2d 311 (citations omitted). The question of agency while normally a question of fact, "becomes a question of law when the facts are undisputed, and only one inference can reasonably be drawn from them." *Id.,* 317 Ark. at 567, 880 S.W.2d 311.

■ An exception to the general rule that a soliciting agent's knowledge is not imputed to the insurer exists when the insured gives correct information to the soliciting agent and the soliciting agent incorrectly records the information onto the application, through fraud, negligence, or mistake. *Jackson v. Prudential Ins. Co. of America,* 736 F.2d 450 (8th Cir.1984). In such cases, the insurance company is bound by the information contained on the application and is estopped from denying coverage. *Time Ins. Co. v. Graves,* 21 Ark.App. 273, 279, 734 S.W.2d 213 (1987).

■ With respect to the extension of coverage by waiver and estoppel, the Arkansas courts have noted that there are exceptions to the axiom that coverage can never be extended by waiver and estoppel. *See e.g., Time Ins. Co. v. Graves,* 21 Ark.App. 273, 279, 734 S.W.2d 213 (1987). " 'The scope of the risk under an insurance policy can be extended by estoppel if the insurer has misled the insured into believing the particular risk is within the coverage.' " *Time Ins.,* 21 Ark.App. at 280, 734 S.W.2d 213, *quoting, Crescent Co., Inc. v. Insurance Co. of North America,* 266 S.C. 598, 225 S.E.2d 656 (1976). The essential elements of estoppel are: (1) ignorance of the party invoking it of the truth as to the facts in question; (2) representations or conduct of the party estopped which mislead; (3) reliance upon such representations or conduct; and (4) prejudicial change of position as a result of such reliance. *Time Ins.,* 21 Ark.App. at 280–81, 734 S.W.2d 213.

In regard to the nature and extent of the relationship between Philadelphia and Carco the court is referred to the provisions of the participation agreement between Fact and Philadelphia. Among other things, the agreement: provides SLI insurance will be offered by Fact members to its customers; states the premium rate; specifies that Philadelphia will provide training, sales and promotional brochures; requires Fact members to place Philadelphia's SLI brochures on its counters where not prohibited by law or regulation; requires Fact members to provide space on the face of the rental agreements or on a separate form, to be accepted and approved by Philadelphia, to permit a customer to indicate whether the customer accepts or declines SLI; upon request Fact members are required to provide a copy of the Philadelphia brochure explaining the coverages and exclusions in the policy to each rental customer who agrees to accept SLI; and allows Fact members to keep as an administrative allowance 30% of the gross premiums collected. With respect to termination of the participation agreement, the agreement provides it shall "remain in full force and effect in respect to all coverage bound prior to the effective date of such cancellation and until the termination of such coverage either by normal cancellation or natural expiration."

■ We believe the Carco rental agents are soliciting agents for Philadelphia. The rental agents offer the insurance coverage to each rental customer. There is no other contact between the insurer and the insured. By opting coverage at the rental counter and paying the set premium the customer becomes an insured under the policy. However absent application of the doctrines of res judicata or collateral estoppel, we find nothing in the facts of this case which allow us under Arkansas law to impute the knowledge of the rental agent to Philadelphia.

■ We believe this case is distinguishable from cases where the insurance agent placed incorrect information on an insurance application or to the insured's detriment misrepresented or misled the insured about the extent of insurance coverage. The "information" or "knowledge" at issue in this case is not knowledge obtained directly from the

insured but rather knowledge that the insurance agent obtained through her own powers of observation. Specifically, her observations of Nash's demeanor, speech, etc., and whether Nash was intoxicated. The only information which indicates the agent had any "knowledge" regarding Nash's allegedly intoxicated state is the fact that a jury in Oklahoma found in the Wallis' favor against Carco on the theory of negligent entrustment.

However, this conclusion does not end our inquiry. It may be that the doctrines of res judicata or collateral estoppel operate to bind Philadelphia to the jury's finding in the underlying tort litigation.

 Reliance takes the position that in federal court diversity cases federal principles of *res judicata* apply. This is simply not the law in the Eighth Circuit. "When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment." *Follette v. Wal-Mart Stores, Inc.,* 41 F.3d 1234, 1237 (8th Cir.1994) (rule applies to res judicata and collateral estoppel). "This rule applies when the original judgment is that of another federal court sitting in diversity." *Id. See also Austin v. Super Valu Stores, Inc.,* 31 F.3d 615, 617 (8th Cir.1994). "Therefore, we apply state, not federal, law." *Austin,* 31 F.3d at 618.

The next question is which state's law should be applied—Arkansas or Oklahoma. Philadelphia appears to assume Arkansas law applies to our analysis. Under Arkansas law, "the test in determining whether res judicata applies is whether the matters presented in a subsequent suit were necessarily within the issues of the former suit and might have been litigated therein." *American Standard, Inc. v. Miller Eng'g, Inc.,* 299 Ark. 347, 351, 772 S.W.2d 344, 346 (1989). The claim preclusion aspect of *res judicata* bars relitigation in a subsequent suit when: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit

was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *See e.g., Carmical v. City of Beebe,* 316 Ark. 208, 211, 871 S.W.2d 386 (1994); *Bailey v. Harris Brake Fire Protection Dist.,* 287 Ark. 268, 697 S.W.2d 916 (1985).

However in reviewing the material submitted by the parties from the Eastern District of Oklahoma, it is clear that the court applied Oklahoma, not Arkansas, law to the case. Thus in analyzing the application of res judicata and collateral estoppel principles, we must apply Oklahoma law.[8]

 "Under the doctrine of res judicata ("claim preclusion"), a final judgment on the merits of an action bars the parties from there relitigating not only the adjudicated claim but also any theories or issues that were actually decided or could have been decided in that action." *Matter of the Estate of Ringwald,* 905 P.2d 833, 835 (Okla.Ct.App. 1995), citing, *Wilson v. Kane,* 852 P.2d 717, 722 (Okla.Ct.App.1993). The elements are: (1) an identity of subject matter, of the parties or their privies, of the capacity of the parties and of the cause of action; (2) the court which heard the original action must have been one of competent jurisdiction; and (3) the judgment rendered must have been a judgment on the merits of the case and not upon purely technical grounds. *Carris v. John R. Thomas and Associates, P.C.,* 896 P.2d 522, 527 (Okla.1995). "[W]here the causes of action differ and the parties are not identical, claim preclusion is inapplicable." *Id.*

"Under collateral estoppel ("issue preclusion"), once a court has decided an issue of fact or law necessary to its judgment, that issue may not be relitigated between the same parties or their privies in a future suit on a different cause of action." *Id.,* 905 P.2d at 835 (citation omitted). "[I]ssue preclusion applies only to those issues actually adjudicated and necessary or essential to the prior judgment." *Carris,* 896 P.2d at 528. "The party relying on a claim of issue preclusion

---

**8.** The rental contract and the insurance contract were entered into in Arkansas. The parties and the court have applied Arkansas law to all other aspects of the case.

bears the burden of establishing that the prior litigation has actually determined the question of fact sought to be precluded. The test is whether the fact in issue in the second action is a question which was actually determined in the first adjudication." *Id.*

"While res judicata acts as a bar to relitigation of the same cause of action between the same parties, the bar of collateral estoppel operates with respect to a different cause of action, in which there is one or more issues which were actually litigated in the former action." *Hildebrand v. Gray,* 866 P.2d 447, 450 (Okla.Ct.App.1993). "In order for the 'privity' rule to apply, the party in privity must actually have the same interest, character, or capacity as the party against whom the prior judgment was rendered." *Id.* "[T]he scope of who qualify as 'privies' varies according to the circumstances of the particular case. In general, it may be said that such privity involves a person so identified in interest with another that he represents the same legal right."

■ On the issue of what specific claims were presented in the Oklahoma tort case the parties have submitted various pleadings. The submitted materials indicate that plaintiffs contended Carco negligently entrusted a vehicle to Nash by renting a vehicle to him while he was in an obvious intoxicated state. The case was submitted to the jury on this theory. The jury was instructed that "[a]n owner or provider of a vehicle has a duty to use ordinary care to avoid renting it to another person whom she knows or reasonably should know is intoxicated." With respect to their verdict, the jury was told that if the damages were caused by the negligent entrustment of Carco a verdict must be returned in the Wallis' favor against Carco.

Philadelphia argues it was not a party to the lawsuit, coverage was not at issue, and to the extent there was a determination that a Carco employee knew or had reason to know that Nash was intoxicated at the time he rented the vehicle such negligence or knowledge cannot be imputed to the plaintiff because there is no privity between the agent and Philadelphia.

We hold the doctrine of collateral estoppel does not preclude Philadelphia from asserting the applicability of the exclusion at issue. Philadelphia did not participate in the proceedings that resulted in the judgment and was not afforded a full and fair opportunity to litigate the coverage issue. *R.L. Underside v. Lathrop,* 645 P.2d 514, 516 n. 6 (Okla. 1982) (concept of collateral estoppel cannot apply when the party against whom the earlier decision is interposed did not have a full and fair opportunity to litigate the critical issue).

No party to the underlying suit was sued in their capacity as an agent for Philadelphia. Privity does not exist for purposes of applying res judicata and collateral estoppel merely because the parties happen to be interested in the same question, or in proving or disproving the same state of facts. *Headley v. Bacon,* 828 F.2d 1272 (8th Cir.1987). The interests of the parties in the tort litigation were not the same.

The jury was merely asked to determine whether Carco's employee was negligent when she rented the vehicle to Nash. Thus, the only finding necessary to support the verdict was that Ms. Johnston did not use ordinary care in renting a car to Nash. In the particular context of this case, the failure to exercise ordinary care was phrased in terms of whether she knew or reasonably should have known Nash was intoxicated at the time she rented the vehicle to Nash.

Reliance asks the court to bar Philadelphia from excluding coverage under the terms of the policy because Ms. Johnston was found to have been negligent. This we cannot do.

*Conclusion.*

For the reasons stated herein, Philadelphia's summary judgment motion will be granted and Reliance's summary judgment motion will be denied by a separate order entered concurrently herewith.

### SUMMARY JUDGMENT

On this 15th day of April, 1996, upon consideration of the cross-motions for summary judgment, the court finds for the reasons stated in a memorandum opinion of even date that Philadelphia Indemnity Insurance Company's motion for summary judgment should

be and hereby is granted. Accordingly, we hold that no duty to defend and no coverage exists under the policy at issue for any of the injuries sustained or death resulting from an automobile accident that occurred on September 10, 1994.

The cross-motion for summary judgment filed by Reliance Insurance Company is denied. This action is hereby dismissed.

IT IS SO ORDERED.